809 A.2d 204

**Sid BURSTEIN and Doreen Burstein, H/W, Appellees,**

**v.**

**PRUDENTIAL PROPERTY AND CASUALTY INSURANCE COMPANY, Appellant.**

Supreme Court of Pennsylvania.

Argued Jan. 29, 2001.

Decided July 17, 2002.

Reargument Denied Sept. 26, 2002.

178

Charles W. Craven, Philadelphia, for Prudential Property Casualty Insurance Company.

Christine P. Busch, James C. Haggerty, Philadelphia, for Pennsylvania Defense Institute.

Milton J. Frank, Philadelphia, for Sid and Doreen Berstein.

Dale G. Larrimore, Philadelphia, for Pennsylvania Trial Lawyers Association.

Before: FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, and SAYLOR, JJ.

## *OPINION*

Chief Justice ZAPPALA.

We granted *allocatur* to determine whether the "regularly used, non-owned car" exclusion and its ensuing contractual restraint on underinsured motorist (UIM) coverage portability violate public policy. For the reasons that follow, we reverse the order of the Superior Court.

On September 4, 1993, Sid and Doreen Burstein were driving in Lower Southampton, Pennsylvania. A speeding motorcyclist struck their vehicle and injured both Mr. and Mrs. Burstein. Subsequently, the motorcyclist's insurance policy surrendered the maximum amount payable under its liability limits, but failed to fully compensate the Bursteins for their injuries. This inadequacy forced the Bursteins to determine whether another insurance policy could cover their damages.

At the time of the accident, Mr. Burstein was driving the vehicle that Mrs. Burstein's employer had provided to her as a benefit of employment. Mrs. Burstein regularly drove the vehicle, both for business and personal use, and had driven employer-provided vehicles throughout the previous eight

years.[1] Mr. Burstein, on the other hand, did not regularly drive the vehicle; in fact, he had only driven it twice prior to the collision. The employer maintained liability insurance on the vehicle through Kemper Insurance Company, but declined uninsured motorist (UM) and UIM coverage. Although Mrs. Burstein received a Kemper insurance card, she never knew that the vehicle lacked UM and UIM coverage. Due to the employer's declination of UM and UIM coverage, the Bursteins could not recover UIM benefits from the Kemper policy.

The Bursteins also owned three vehicles, none of which were involved in the collision. All of these vehicles were insured with liability, UM, and UIM coverage through Prudential Property and Casualty Insurance Company. The Bursteins submitted a claim for UIM benefits under the Prudential policy. Prudential denied the claim because the policy specifically excluded regularly used, non-owned cars, such as Mrs. Burstein's employer-provided vehicle. Thereafter, the Bursteins sued Prudential and claimed that the regularly used, non-owned car exclusion is unenforceable because it violates public policy.

A panel of arbitrators determined that the policy exclusion violates public policy as applied to Mr. Burstein, but not as applied to Mrs. Burstein. Both Prudential and the Bursteins petitioned the trial court for a modification of the arbitration decision. While the Bursteins argued that the exclusion violates public policy as applied to both, Prudential defended that the exclusion did not violate public policy in either instance. The trial court held that the exclusion violated public policy as applied to both insureds, thereby affirming the arbitrator's decision as to Mr. Burstein, but reversing as to Mrs. Burstein.

Prudential appealed and a divided panel of the Superior Court affirmed. Upon Prudential's application for reargument, the court granted reargument *en banc* and withdrew its memorandum decision. The Superior Court, *en banc*, af-

1. Mrs. Burstein used the vehicle primarily for business purposes, but paid a twenty-five dollar weekly fee so that she could drive it for her personal use as well.

.

firmed. *Burstein v. Prudential Prop. & Cas. Ins. Co.,* 742 A.2d 684 (Pa.Super.1999) (plurality opinion). Judge Schiller, joined by Judges Kelly and Stevens, authored the opinion in support of affirmance. The court relied on three "prevailing policies" that, in its view, favored voiding the regularly used, non-owned car exclusion: (1) Pennsylvania's Motor Vehicle Financial Responsibility Law, 75 Pa.C.S. §§ 1701–1799.7, hereinafter MVFRL, should be construed to provide the greatest possible coverage to injured claimants; (2) providing UIM coverage is in the public's best interest; and (3) UIM coverage is first-party coverage and therefore "follows the person, not the vehicle." *Burstein,* 742 A.2d at 687–88. Thus, the court held that voiding the exclusion "furthers the afore-mentioned public policies by providing the greatest possible coverage to the [Bursteins], by compensating them for injuries caused by a tortfeasor who had inadequate coverage, and by allowing them to recover underinsured motorist coverage they had specifically paid for under their policy with [Prudential]." *Id.* at 688.

President Judge McEwen authored a concurring and dissenting opinion, which Judges Ford Elliott and Lally–Green joined. President Judge McEwen disagreed with the court's holding that UIM coverage "follows the person, not the vehicle." *Id.* at 691. Nonetheless, he agreed with the court's result because the Bursteins had purchased UIM insurance on all three of their owned vehicles and therefore were not attempting to reap UIM benefits for multiple vehicles from a single-vehicle policy. *Id.* at 693.

Judge Cavanaugh, joined by Judges Popovich and Johnson, authored a dissenting opinion. Judge Cavanaugh pointed out that the court's analysis ignored the legislative concern for the increasing cost of automobile insurance and argued that the majority's reasons for voiding the policy exclusion did not rise to the level of public policy. *Id.* at 694. Accordingly, the dissent would have upheld the regularly used, non-owned car exclusion. Prudential petitioned this Court for allowance of appeal, which we granted. *Burstein v. Prudential Prop. & Cas. Ins. Co.,* 563 Pa. 670, 759 A.2d 919 (2000).

■ This Court is empowered to review an arbitration award that declares an insurance policy clause void as violative of public policy. *Hall v. Amica Mut. Ins. Co.*, 538 Pa. 337, 648 A.2d 755, 758 (1994). Generally, courts must give plain meaning to a clear and unambiguous contract provision unless to do so would be contrary to a clearly expressed public policy. *Eichelman v. Nationwide Ins. Co.*, 551 Pa. 558, 711 A.2d 1006, 1008 (1998) (citing *Antanovich v. Allstate Ins. Co.*, 507 Pa. 68, 488 A.2d 571, 575 (1985)). Here, the contract provision is an automobile insurance policy exclusion, which reads, in relevant part:

PART 5[:] UNDERINSURED MOTORISTS ... IF YOU ARE HIT BY A MOTOR VEHICLE THAT IS UNDER-INSURED

\* \* \*

LOSSES WE WILL NOT PAY FOR (PART 5)

\* \* \*

REGULARLY USED NON–OWNED CARS

We will not pay for bodily injury to you or a household resident using a non-owned car not insured under this part, regularly used by you or a household resident.

R. at 25a–26a (emphasis omitted). The plain language of this provision clearly and unambiguously delineates an exclusion for regularly used, non-owned vehicles. Indeed, the parties agree that the exclusion, if applied, severs the portability of Appellees' UIM coverage to any regularly used, non-owned cars. As a result, the policy simply does not cover Appellees' claim. Thus, their only remaining avenue of relief is to demonstrate that the regularly used, non-owned car exclusion and its contractual restraint on UIM portability violate a clearly expressed public policy.

■ This Court has repeatedly confronted the formless face of public policy. Wary of its vague nature, we have adopted a circumspect posture:

Public policy is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interest. As the term "public policy" is

vague, there must be found definite indications in the law of the sovereignty to justify the invalidation of a contract as contrary to that policy.... Only dominant public policy would justify such action. In the absence of a plain indication of that policy through long governmental practice or statutory enactments, or of violations of obvious ethical or moral standards, the Court should not assume to declare contracts ... contrary to public policy. The courts must be content to await legislative action.

*Eichelman,* 711 A.2d at 1008; *see also Hall,* 648 A.2d at 760 (quoting *Muschany v. United States,* 324 U.S. 49, 66–67, 65 S.Ct. 442, 89 L.Ed. 744 (1945)). Moreover, the application of public policy concerns in determining the validity of an insurance exclusion is dependent upon the factual circumstances presented in each case. *Paylor v. Hartford Ins. Co.,* 536 Pa. 583, 640 A.2d 1234, 1240 (1994).

■ Here, because the Pennsylvania Legislature has already enacted the MVFRL, the vexation of awaiting legislative action does not hinder our analysis. Pertaining to the public policy concerns of the MVFRL, our Court has repeatedly spelled out that

[t]he repeal of the No–Fault Act[2] and the enactment of the MVFRL reflected a legislative concern for the spiralling consumer cost of automobile insurance and the resultant increase in the number of uninsured motorists driving on public highways. The legislative concern for the increasing cost of insurance is the public policy that is to be advanced by statutory interpretation of the MVFRL. This reflects the General Assembly's departure from the principle of "maximum feasible restoration" embodied in the now defunct No–Fault Act.

*Paylor,* 640 A.2d at 1235; *see also Donnelly v. Bauer,* 553 Pa. 596, 720 A.2d 447, 452 (1998); *Eichelman,* 711 A.2d at 1008; *Rump v. Aetna Cas. and Sur. Co.,* 551 Pa. 339, 710 A.2d 1093, 1096 (1998); *Hall,* 648 A.2d at 761; *Windrim v. Nationwide*

2. Act of July 19, 1974, P.L. 489, *as amended,* 40 P.S. §§ 1009.101– 1009.701, *repealed by* the Act of February 12, 1984, P.L. 26. The No– Fault Act was the predecessor to the MVFRL.

*Ins. Co.,* 537 Pa. 129, 641 A.2d 1154, 1157–58 (1994). Indeed, the Legislature's concern for the increasing cost of automobile insurance and the parallel aim of cost containment are easily gleaned from the legislative history of the MVFRL.[3] *See* Senate Journal, Oct. 4, 1983, 1142–53; House Journal, Dec. 13, 1983, 2139–59.

■ Rules and regulations of the Pennsylvania Insurance Department are also relevant when considering the MVFRL. The Department is charged with administering and enforcing the MVFRL and "may make rules and regulations necessary for the administration and enforcement of [the MVFRL]." 75 Pa.C.S. § 1704(b). As a result, the Department's regulations relating to coverage exclusions could be persuasive in some cases. *See, e.g., Hall,* 648 A.2d at 760. Indeed, an agency's substantive regulations, when properly enacted under the Commonwealth Documents Law,[4] have the force and effect of law and enjoy a general presumption of reasonableness. *Borough of Pottstown v. Pennsylvania Mun. Ret. Bd.,* 551 Pa. 605, 712 A.2d 741, 743 (1998). Accordingly, if the Insurance Department had enacted any pertinent UIM regulations, they would apply here with the full force and effect of law. The Department, however, has not promulgated any UIM regulation relating to the regularly used, non-owned car exclusion.[5] Hence, this Court must return to the central issue: clearly expressed public policy and its effect on the coverage exclusion.

■ In light of the primary public policy concern for the increasing costs of automobile insurance, it is arduous to

---

**3.** While we recognize that other public policies may underlie the MVFRL, the "legislative concern for the spiralling consumer cost of automobile insurance" is its dominant and overarching public policy. *Paylor,* 640 A.2d at 1235.

**4.** Act of July 31, 1968, P.L. 769, No. 240, *as amended,* 45 P.S. §§ 1102–1208.

**5.** In addition, the parties do not offer any discussion of the Department's regulations, except to nakedly claim that the Department has approved of the policy's terms and has not prohibited use of the regularly used, non-owned vehicle exclusion. Appellant's Brief at 25, 28.

invalidate an otherwise valid insurance contract exclusion on account of that public policy. This policy concern, however, will not validate any and every coverage exclusion; rather, it functions to protect insurers against forced underwriting of unknown risks that insureds have neither disclosed nor paid to insure. Thus, operationally, insureds are prevented from receiving gratis coverage, and insurers are not compelled to subsidize unknown and uncompensated risks by increasing insurance rates comprehensively.

Here, voiding the exclusion would frustrate the public policy concern for the increasing costs of automobile insurance, as the insurer would be compelled to underwrite unknown risks that it has not been compensated to insure.[6] Most significantly, if this Court were to void the exclusion, insureds would be empowered to regularly drive an infinite number of non-owned vehicles, and receive gratis UIM coverage on all of those vehicles if they merely purchase UIM coverage on one owned vehicle. The same would be true even if the insureds never disclose any of the regularly used, non-owned vehicles to the insurers, as is the case here. Consequently, insurers would be forced to increase the cost of insurance, which is precisely what the public policy behind the MVFRL strives to prevent. Such result is untenable.

Nonetheless, Appellees make broad claims about the universal portability of UM and UIM coverage. Appellees reason that, as UIM coverage is first party coverage, it is essentially portable; in other words, because UIM coverage is personal, it should "follow the person, not the vehicle." Thus, they conclude that their "use of a non-owned vehicle on the night of the accident placed no additional risk upon Prudential...." Appellees' Brief at 24–26. Despite Appellees' wide arguments, the only issue in this appeal is whether the regularly used, non-owned car exclusion and its contractual restraint on UIM portability violate a clearly expressed public policy.

6. Appellees baldly assert that, as they paid for liability, UM, and UIM coverage on all three of their vehicles, the public policy behind the MVFRL is achieved and surpassed. Appellees, however, fail to account for their *fourth* vehicle, the employer-provided car that is at issue here.

The MVFRL sets forth dissimilar priority schemes for first party coverage versus UM and UIM coverage. The MVFRL defines "first party benefits" as "[m]edical benefits, income loss benefits, accidental death benefits and funeral benefits." 75 Pa.C.S. § 1702. First party benefits must be recovered in the following priority: (1) for a named insured, the policy on which he is the named insured; (2) for an insured, the policy covering the insured; and (3) for the occupants of an insured motor vehicle, the policy on that motor vehicle. 75 Pa.C.S. § 1713. Thus, first party coverage truly "follows the person," as only injured claimants who are not an "insured" under a policy of insurance may recover first party benefits from the insurer of the vehicle in which they were occupants. Conversely, the MVFRL provides an inverse priority of recovery for UM and UIM benefits. Injured claimants must first recover UM and UIM coverage from any policy covering the *motor vehicle* occupied by the injured person at the time of the accident. 75 Pa.C.S. § 1733(a)(1). Thereafter, as a *secondary* source of recovery, claimants may recover from a policy covering a motor vehicle not involved in the accident.[7] *Id.* at § 1733(a)(2). These divergent priority schemes demonstrate that, under the MVFRL, UM and UIM benefits do not necessarily "follow the person" in the same manner as first party benefits.

Moreover, it is clear that Appellees' contention takes the practical realities of insurance for granted. Several dynamics affect an insurer's risks pertaining to an insured's regular use of a non-owned car: the type of car; the safety features of the car; the cost of repairing and maintaining the car; the miles regularly logged on the car; etc. To illustrate, if an insured's employer-provided car offered only nominal safety features, the risk of injury would be far greater than if the insured were driving a vehicle that boasted state-of-the-art safety features. In effect, the heightened risks increase the probability that damages will exceed a tortfeasor's liability policy

7. While Section 1733 contemplates that UM and UIM coverage may be portable in some instances, it does not suggest that UM or UIM coverage would extend where the coverage has been specifically excluded, as is the case here.

and, thereby, trigger an insured's UIM coverage; once UIM coverage is invoked, the risks then increase the amount payable under the coverage. Here, these risks flowed with the employer-provided vehicle and not Mrs. Burstein; thus, it is illogical to conclude that the benefits should follow Mrs. Burstein without proper compensation to the insurer.

From a practical standpoint, Mrs. Burstein should have taken affirmative steps to determine whether the employer-provided vehicle was insured and, if so, with what types of coverage. This is especially glaring in view of Mrs. Burstein's use of employer-provided vehicles for over eight years. Stipulated Facts at 2. Once she would have discovered the lack of UIM coverage, she would have had several options. First, she could have accepted the vulnerability of driving the vehicle without UIM coverage. While this may not have been the option preferred by Mrs. Burstein, this Commonwealth does not require UIM coverage. See 75 Pa.C.S. § 1731(a) (requiring the offer of UM and UIM motorist coverage, but declaring that such coverage is optional). Thus, tolerating the risk of injury from an underinsured motorist was a viable option for Mrs. Burstein. Second, she could have obtained UIM coverage for the vehicle in either of two ways: she could have negotiated with her employer for it to purchase UIM coverage on the vehicle; or, if the employer refused, there is no evidence of record suggesting that Mrs. Burstein could not have purchased the coverage herself. Lastly, if Mrs. Burstein could neither obtain the desired UIM coverage nor accept the risk of driving the employer-provided vehicle without UIM coverage, then she could have refused to drive the car.

Accordingly, we hold that the regularly used, non-owned car exclusion and its contractual restraint on UIM portability comport with the underlying policies of the MVFRL, and reverse the order of the Superior Court.[8]

Justice NEWMAN did not participate in the consideration or decision of this case.

---

**8.** We do not purport to hold that UIM coverage is not portable under any circumstances.

Former Chief Justice FLAHERTY did not participate in the decision of this case.

Justice SAYLOR files a dissenting opinion.

Justice SAYLOR, dissenting.

The central public policy at issue in this appeal is expressly established by the General Assembly and embodied in the statutory requirement that companies providing motor vehicle insurance coverage in Pennsylvania must offer UM and UIM coverage to the insurance buying public. *See* 75 Pa.C.S. § 1731(a). Fundamental questions thus presented are: what precisely was the General Assembly's conception of UM and UIM insurance when it first mandated such coverage; if it did not have a fixed understanding, to whom did it intend to delegate the determination of what must be offered; and have the legislative ideas in these regards changed over time?

In its opinion, the majority's implicit response to the first of these questions appears to be that the General Assembly maintained no fixed conception of UM and UIM insurance when it mandated their offering. Rather, the majority opinion seems to suggest that the Legislature was content to delegate to insurers the determination of what the required offering must entail, so long as exclusions from coverage may be justified, in the most generalized manner, under the rubric of cost containment (on which basis virtually any and all exclusions and restrictions on coverage can be defended). Moreover, the majority opinion also implies that the legislative understanding of UM and UIM insurance has changed over time, particularly as this Court previously had endorsed the view that portability was an essential characteristic of UM and UIM insurance.

While I tend to agree with the majority's apparent assessment that the General Assembly afforded a degree of latitude in terms of what must be offered as UM and UIM coverage, I disagree that it designed to effectively leave the decision to insurers. Upon close review of the entire statutory framework, it is my best judgment that the delegated latitude as was afforded, not to insurers, but rather, to the entity statutorily vested with the responsibility to implement the pertinent

regulatory scheme, namely, the Insurance Department. In this regard, a comprehensive review of the relevant Pennsylvania decisional law also suggests that the inconsistent judicial decisions in this area (and, in particular, the line of decisions that have voided exclusions sanctioned under duly promulgated regulations) may have had the unintended and unfortunate effect of essentially displacing the Insurance Department from its role in this regard. The remedy is not for the Court to merely abandon the regulatory role that it assumed by now reciting the phrase cost containment as a mantra, without addressing the substantial void created by this course of action in the landscape as it presently exists. Rather, I would acknowledge the conflict in the cases and endeavor to establish an appropriate and consistent understanding of the legislative scheme as it pertains to UM and UIM insurance, including the roles of the judicial and the executive branches, which expressly recognizes the critical part of the Insurance Department. In answer to the last question posed, I simply do not believe that the General Assembly's core conception of UM and UIM coverage has changed over time. Although the Legislature has implemented extensive measures facilitating cost containment, it has maintained core concepts such as UM and UIM coverage in furtherance of the overall remedial purposes of the statutory scheme.

Thus, I view this case as an opportunity to clarify and correct the relevant decisional law, to ameliorate fluctuations and uncertainties that have pervaded the jurisprudence in this area, and to establish a foundation for advancement of all salient legislative purposes involved. To this end, I would undertake the necessary review in this case as follows:

## I. Background

The substantive discussion, below, includes references to the historical development of the legislative conception of UIM coverage in the context of Pennsylvania's motor vehicle insurance law; various forms of exclusions sought to be included within such coverage; and certain specific attributes of UM/UIM insurance. This section provides a brief overview of these concepts. Since UIM insurance constitutes an out-

growth or extension of UM insurance, such coverage and its development in Pennsylvania are discussed as well.

In *Lewis v. Erie Ins. Exchange,* 568 Pa. 105, 793 A.2d 143 (2002), this Court recently summarized the historical background of the Motor Vehicle Financial Responsibility Act,[1] beginning with the former No–Fault Motor Vehicle Insurance Act,[2] and its attendant policy of maximum feasible restoration to accident victims, as well as the UM Act, which codified the mandatory requirement of UM coverage in liability insurance policies. *See Lewis,* 568 Pa. at 117–21, 793 A.2d at 150–52. Additionally, for present purposes it is significant that the Insurance Department promulgated substantive regulations establishing specific minimum criteria for UM insurance, via reference to a national standard form. *See* 31 Pa.Code § 63.2. *Lewis* further discusses the promulgation of the MVFRL as a response to rising insurance costs under the No–Fault Act and the many changes implemented thereunder, including the: reduction of unlimited medical coverage to a mandatory $10,000 minimum; reduction of income loss benefits; elimination of stacking of first-party benefits; requirement that a vehicle owner show financial responsibility at the time of registration in terms of an ability (by way of insurance or otherwise) to respond to specified damages claims; and imposition of penalties upon owners failing to maintain financial responsibility. *Lewis,* 568 Pa. at 117–21, 793 A.2d at 150–52 (citing *Berger v. Rinaldi,* 438 Pa.Super. 78, 82, 651 A.2d 553, 554 (1994)).

Although the UM Act was not repealed, it was supplanted in some respects by the MVFRL, which notably contained its own requirement that UM coverage be provided. *See Hackenberg v. Southeastern Pa. Transp. Auth.,* 526 Pa. 358, 363 n. 4, 586 A.2d 879, 881 n. 4 (1991). The MVFRL also required UIM coverage to be included in all motor vehicle policies delivered or issued in Pennsylvania, with UM and UIM coverage in amounts equal to bodily injury liability coverage, unless

1. Act of February 12, 1984, P.L. 26, No. 11 (effective October 1, 1984) (as amended, 75 Pa.C.S. §§ 1701–1799.7) (the "MVFRL").

2. Act of July 19, 1974, P.L. 489, No. 176 (codified at 40 P.S. § 1009.101–1009.701 (repealed)) (the "No–Fault Act").

the named insured made a written request for a lesser amount. *See* 75 Pa.C.S. §§ 1731, 1734 (superseded). Among other substantial revisions to the MVFRL that occurred in 1990,[3] also designed to enhance the ability of insurers to control costs, the General Assembly made the purchase of UM and UIM coverage optional, although insurers remained obligated to offer the coverage.[4] As frequently emphasized in the decisional law, the enactment of and amendments to the MVFRL clearly demonstrate a departure from the principle of maximum feasible restoration that was embodied in the No–Fault Act. *See Donnelly v. Bauer*, 553 Pa. 596, 606, 720 A.2d 447, 452 (1998); *Eichelman v. Nationwide Ins. Co.*, 551 Pa. 558, 564, 711 A.2d 1006, 1008 (1998) (citing *Rump v. Aetna Cas. & Surety Co.*, 551 Pa. 339, 710 A.2d 1093 (1998)); *Windrim v. Nationwide Ins. Co.*, 537 Pa. 129, 136, 641 A.2d 1154, 1157–58 (1994) (citing Senate Journal, Oct. 4, 1983, 1142–53; House Journal, Dec. 13, 1983, 2139–59).

In setting forth the mandatory offer of UIM coverage, the General Assembly prescribed:

Underinsured motorist coverage shall provide protection for persons who suffer injury arising out of the maintenance or use of a motor vehicle and are legally entitled to recover damages therefor from owners or operators of underinsured motor vehicles.

75 Pa.C.S. § 1731(c).[5] The provision was added to fill a void left by UM coverage, so as to provide individuals with indemnification in the event negligent motorists are not adequately

3. *See* Act of Feb. 7, 1990, P.L. 11, No. 6.

4. Section 1731(a) provides:

(a) Mandatory offering.—No motor vehicle liability insurance policy shall be delivered or issued for delivery in this Commonwealth, with respect to any motor vehicle registered or principally garaged in this Commonwealth, unless uninsured motorist and underinsured motorist coverages are offered therein or supplemental thereto in amounts as provided in section 1734 (relating to request for lower limits of coverage). Purchase of uninsured motorist and underinsured motorist coverages is optional.

75 Pa.C.S. § 1731(a).

5. This provision mirrors Section 1731(b), pertaining to UM coverage. *See* 75 Pa.C.S. § 1731(b). The MVFRL defines "underinsured motor

insured for liabilities that they may incur.[6]    Accordingly, together with UM coverage, UIM coverage serves to promote the recovery of damages for innocent victims of accidents with uninsured or underinsured drivers.[7]    The Insurance Department's regulation pertaining to UM coverage remains extant,

> vehicle" as a "motor vehicle for which the limits of available liability insurance and self-insurance are insufficient to pay losses and damages," and "uninsured motor vehicle," *inter alia,* as a motor vehicle with no liability coverage. 75 Pa.C.S. § 1702.

6.  As the Superior Court has explained:

> claimants who purchased uninsured motorist coverage were in a better position when they were involved in a car accident with an *uninsured* tortfeasor rather than an underinsured tortfeasor. If they were hit by an uninsured tortfeasor, they could recover from their uninsured motorist benefits; however, if they were hit by an underinsured tortfeasor, they could not recover from that coverage but were limited to recovering the minimal amount of benefits available to them under the tortfeasor's insurance. The legislature enacted the underinsured motorist coverage in the MVFRL to resolve this anomaly.

> *Newkirk v. United Services Auto. Ass'n,* 388 Pa.Super. 54, 58, 564 A.2d 1263, 1264–65 (1989); *see also Eichelman,* 551 Pa. at 564, 711 A.2d at 1008–09; *Paylor v. Hartford Ins. Co.,* 536 Pa. 583, 587, 640 A.2d 1234, 1235–36 (1994) (stating that the purpose of UIM coverage is " 'to protect the insured (and his additional insureds) from the risk that a negligent driver of another vehicle will cause injury to the insured (or his additional insureds) and will have inadequate liability coverage to compensate for the injuries caused by his negligence' " (quoting *Wolgemuth v. Harleysville Mut. Ins. Co.,* 370 Pa.Super. 51, 58, 535 A.2d 1145, 1149 (1988))).

7.  Based upon this relationship and the substantial similarity of the legislative prescriptions for UM and UIM coverage, courts frequently recognize the relevance of decisional law pertaining to UM coverage when considering the applicability of UIM coverage. *See, e.g., Jeffrey v. Erie Ins. Exch.,* 423 Pa.Super. 483, 505, 621 A.2d 635, 646 (1993) ("Our legislature . . . intended underinsured motorist coverage to operate in the same manner as uninsured motorist coverage only for motorists who were injured by underinsured motorists."); *Newkirk,* 388 Pa.Super. at 63, 564 A.2d at 1267 (same); *Marroquin v. Mutual Benefit Ins. Co.,* 404 Pa.Super. 444, 450, 591 A.2d 290, 293 (1991) (noting that "[t]he Financial Responsibility Law also acts to eliminate the distinctions between uninsured motorist protection and underinsured motorist protection" (citation omitted)). *See generally* ALAN I. WIDISS, UNINSURED AND UNDERINSURED MOTORIST INSURANCE 2d (rev.) § 31.6 (2001) (recognizing the overlap of issues pertaining to UM and UIM coverage and describing areas as to which distinct treatment is appropriate); *Allwein v. Donegal Mut. Ins. Co.,* 448 Pa.Super. 364, 373–74, 671 A.2d 744, 749–50 (1996) (presenting an example of a potential distinction between UM and UIM coverage, in that some jurisdictions regard UIM

*see* 31 Pa.Code § 63.2; however, it has not reposited a current, formal regulation in the Pennsylvania Code establishing minimum standards for UIM insurance.

In connection with the mandatory offer of UM and UIM insurance, insurers frequently seek to make various exclusions from coverage, such as the exclusion pertaining to regularly used non-owned vehicles presently at issue.[8] The purpose of such exclusion is apparently to permit the insurer to capture an additional premium in exchange for the specific coverage. *Cf. Crum and Forster Personal Ins. Co. v. Travelers Corp.,* 428 Pa.Super. 557, 559–60, 631 A.2d 671, 672–73 (1993) (discussing the regularly used non-owned car exclusion as it pertains to the liability portion of automobile insurance policies).[9] Similarly, insurers frequently seek to apply an exclusion during the use of a vehicle which is owned within the

coverage as "gap" as opposed to "excess" coverage, although ultimately rejecting such distinction for purposes of Pennsylvania jurisprudence).

**8.** As reflected in the majority opinion, the text of the exclusion in question if as follows:

**REGULARLY USED NON–OWNED CARS**

**We** will not pay for **bodily injury** to **you** or a **household resident** using a **non-owned car** not insured under this part, regularly used by **you** or a **household resident.**

(emphasis in original). The general provisions of the Prudential policy explain that highlighting is employed to designate defined terms. *See infra.*

**9.** In *Crum and Forster,* the Superior Court stated:

The purpose of the ["regular use"] language was to provide coverage to the insured or members of her family while engaged in casual or infrequent use of a vehicle other than the one described in the policy, but not to cover the insured or members of her family with respect to another vehicle which he or she used or had the opportunity to use frequently.

\* \* \*

The clause in question represents an attempt on the part of the insurance company to strike a balance between the desire of the insured to be covered, even though not using his own car, and its own right to receive payment of premiums based upon the risk presented by the number of automobiles operated. It is generally held that such a clause covers the insured during infrequent or casual use of a nonowned automobile, but excludes coverage as to another's automobile which the policyholder frequently uses or has the opportunity to use.

named insured's household but is not identified on the declarations page of the policy. Often referred to as the "other owned vehicle/household family member exclusion,"[10] this is perhaps the most frequently litigated exclusion and, for this reason and because of its similarity to the regularly used non-owned car exclusion, is discussed extensively herein. These exclusions are subsets of the category of "geographic exclusions," used in its broadest sense to mean any exclusion through which an insurer seeks to limit the portability of UM or UIM insurance. *See generally* Theodore J. Smetak, *Underinsured Motorist Coverage in Minnesota: Old Precedents in a New Era,* 24 WM. MITCHELL L.REV. 857, 905 (1998) (stating that "[g]eographic exclusions prevent the insurance from 'following the person' ").[11] The discussion also makes

*Id.; accord State Farm Mut. Auto. Ins. Co: v. Brnardic,* 441 Pa.Super. 566, 569–70, 657 A.2d 1311, 1313 (1995) (upholding application of a regularly used non-owned car exclusion as pertaining to liability coverage). Notably, in the UM/UIM context, some authorities would dispute the degree to which the insurer's risk is increased by allowing the covered, regular use of a non-owned vehicle. For example, courts have taken notice that:

[t]he type of premium charged for uninsured motorist protection illustrates the coverage afforded. The rate is a flat rate, and coverage is available to everyone at the same rate. The rate is not related to risk. [T]he fact that [the insured] had purchased uninsured motorist coverage for only one vehicle and paid a premium on this vehicle does not give rise to the exclusion of coverage on any other owned vehicles.

*Jacobson v. Implement Dealers Mut. Ins. Co.,* 196 Mont. 542, 640 P.2d 908, 911 (1982); *see also State Farm Auto. Ins. Co. v. Reaves,* 292 Ala. 218, 292 So.2d 95, 100 (1974). In the majority's explications of UM/UIM insurance and associated risks, *see* Majority Opinion, at 209, it does not distinguish UM and UIM from collision coverage in these regards.

10. An example of such an exclusion is presented in *Windrim,* 537 Pa. at 129, 641 A.2d at 1154, pursuant to which the insurer provided that the UM/UIM coverage

does not apply to bodily injury suffered while occupying or from being hit by a motor vehicle owned by you or a relative living in your household, but not insured for Uninsured or Underinsured Motorist Coverage under this policy.

*Windrim,* 537 Pa. at 131, 641 A.2d at 1155.

11. Used in this sense, the term "geographic exclusions" is broader than and includes "territorial exclusions." *See, e.g., Hall v. Amica Mut. Ins. Co.,* 538 Pa. 337, 343, 648 A.2d 755, 758 (1994).

reference to a "family car exclusion," by which insurers frequently provide that the insured vehicle cannot be an underinsured vehicle for purposes of determining entitlement to UIM benefits. *See, e.g., Wolgemuth,* 370 Pa.Super. at 54, 535 A.2d at 1147. This exclusion typically has relevance when a guest passenger seeks to collect both liability and UIM benefits from the same insurer after a single-vehicle accident. *See, e.g., id.*

As an additional element of background, it is often necessary to distinguish between classes of insureds in motor vehicle policies in order to assess the availability of coverage. The MVFRL defines an "insured" as the named insured, designated insureds, and certain household family members. *See* 75 Pa.C.S. § 1702. This class of insureds has the strongest claim to portability of coverage, as their claim arises by virtue of their relationship with the named insured who maintains a contractual relationship with the insurer. Other categories of persons who may have a claim include guest occupants, who, by definition, must establish a nexus with a motor vehicle insured for UIM coverage. *See generally Dupin v. Adkins,* 17 S.W.3d 538, 543 (Ky.Ct.App.2000). Here, the Bursteins are named insureds under the Prudential policy, and therefore, have the strongest potential claim to portability of the UIM insurance for which they contracted.

Finally, the discussion below includes a survey of law from other jurisdictions. Such approach is a common one among courts in their efforts to interpret the intent of legislative bodies as they have provided for uninsured and underinsured motorist coverage in a generalized fashion, with sparse direction concerning implementation. As noted below, the approach has been employed in varying degrees by the Superior Court in this area, as well as by this Court. *See, e.g., Paylor,* 536 Pa. at 591–97, 640 A.2d at 1237–41 (Zappala, C.J.) (discussing, extensively, pertinent decisions from the courts of Washington and Minnesota as they pertain to the UIM context).

## II.  The Superior Court's Opinion

I would begin the substantive review with a close examination of the Superior Court's divided, *en banc* decision in this case.  In the lead opinion, Judge Schiller, joined by Judges Kelly and Stevens, acknowledged that the regularly used non-owned car exclusion is clear and unambiguous and, if enforced according to its terms, would preclude the Bursteins from recovering UIM benefits from Prudential.  *See Burstein v. Prudential Property and Cas. Ins. Co.*, 742 A.2d 684, 686 n. 4 (Pa.Super.1999) (plurality; *en banc*).  The lead judges, however, agreed with the common pleas court's conclusion that, first and foremost, the General Assembly conceived UIM coverage as portable, in that the coverage follows the person and not the vehicle.  *See id.* at 688 (stating that "if an individual purchases underinsured motorist coverage, that individual will be protected from negligent drivers with inadequate coverage regardless of the vehicle in which he or she happens to be injured").  In this regard, the lead opinion referenced Minnesota decisional law, which the court previously had employed as a reference in construing the Uninsured Motorists Coverage Act.[12]  *See Burstein*, 742 A.2d at 688 (citing *Myers v. State Farm Mut. Auto. Ins. Co.*, 336 N.W.2d 288, 291 (Minn.1983)).  Further, the lead judges reasoned:

> The statutory language of the MVFRL ... clearly contemplates a situation in which an insurance company will be required to provide underinsured motorist coverage for an insured who is injured while using a vehicle not covered under one of its policies.  When an individual is injured in a motor vehicle accident, the tortfeasor's insurance carrier must compensate that individual for his or her injuries.  *See generally* 75 Pa.C.S. §§ 1701–1799.7. If the tortfeasor's policy limits are inadequate, the individual is also entitled to recover underinsured motorist coverage from his or her personal insurance carrier, provided that the individual did not waive such coverage.  Where the insured is covered by

12.  Act of August 14, 1963, P.L. 909, § 1 (codified as amended at 40 P.S. § 2000) (the "UM Act").  The UM Act was repealed in part by the Act of February 12, 1984, P.L. 26, No. 11 § 8(c), insofar as inconsistent with the MVFRL.

more than one policy providing underinsured motorist coverage, however, the MVFRL specifically states that the policy covering the motor vehicle involved in the accident must pay first, followed by the "policy *covering a motor vehicle not involved in the accident* with respect to which the injured person is an insured." 75 Pa.C.S. § 1733(a)(2) (emphasis added).

*Burstein,* 742 A.2d at 688. Accordingly, the lead opinion described UIM coverage for injuries sustained by the Bursteins in the company car as coverage for which they had specifically paid. *See id.* at 689. More generally, the opinion emphasized the MVFRL's manifestation of a liberal compensatory scheme of UIM protection and the desirability of a construction affording the greatest possible coverage to injured claimants. *See id.* at 687 (stating that "it is in the public's best interest for insurance companies to provide underinsured motorist coverage"); *id.* at 688 (indicating that the Bursteins "are precisely the type of individuals who underinsured motorist coverage was designed to protect—individuals injured by a tortfeasor with inadequate insurance coverage"). The Superior Court lead, however, also acknowledged that the General Assembly's purpose in enacting the MVFRL was to alleviate spiraling costs of insurance and a corresponding increase in the number of uninsured motorists. *See id.* at 689 (citing *Paylor,* 536 Pa. at 587, 640 A.2d at 1235). In this regard, the lead opinion stated:

> as the frequency of operating the vehicles increases, so does the risk that the insured will be injured by an underinsured motorist. Voiding this particular exclusion in every insurance policy would essentially require insurance companies to provide underinsured motorist coverage for all company cars used by their insureds when such coverage was never discussed, contemplated or paid for by the insured, a risk many insurance companies would deem substantial.

*Burstein,* 742 A.2d at 689. The lead judges reasoned, nevertheless, that if they were to accept the cost containment policy as controlling, courts would be unable to void any exclusion on

public policy grounds, a situation which it found to be untenable and inconsistent with the court's prior decisions. *See id.*

The lead judges thus expressly viewed their task as weighing the competing policy interests and determining which interests should prevail in the circumstances presented. *See id.* at 687. For the reasons first identified by the common pleas court (the Bursteins maintained liability and UIM coverage on all of their vehicles, had no knowledge of the decision of Mrs. Burstein's employer to forego UIM coverage, and were not attempting to avoid their responsibility to purchase adequate insurance), the lead judges determined that upholding the exclusion would not foster the cost containment policy. *See id.* at 690–91. More affirmatively, the lead opinion stated that:

> voiding the "regularly used non-owned car" exclusion under the facts of this case furthers the aforementioned public policies by providing the greatest possible coverage to the [Bursteins], by compensating them for injuries caused by a tortfeasor who had inadequate coverage, and by allowing them to recover underinsured motorist coverage they had specifically paid for under their policy with [Prudential].
>
> * * *
>
> In sum, we find that in this case the public policies in favor of *voiding* the exclusion supersede that which favors upholding it. We therefore hold that under the present facts— where an insured has complied with both the letter and spirit of the MVFRL and was not notified that the vehicle he or she was regularly using was not covered by underinsured motorist coverage—the policy provision denying underinsured motorist coverage for a "regularly used non-owned car" is void as against public policy.

*Id.* at 688–89, 691 (emphasis in original).

In an opinion that was joined by Judges Ford Elliott and Lally–Green, then-President Judge McEwen agreed with the disposition but disagreed with the assertion expressed in the lead opinion that UIM benefits are first-party benefits that follow the person rather than the vehicle. *See Burstein,* 742

A.2d at 691 (McEwen, P.J., concurring and dissenting). In this regard, the concurring and dissenting judges noted that the MVFRL defines "first party benefits" as medical, loss of income, accidental death, and funeral benefits. *See id.* at 691 (quoting 75 Pa.C.S. § 1702). Further, the concurring and dissenting opinion observed that the priority scheme for UIM benefits is inverse to that governing first-party benefits, in that a claimant seeking first-party benefits is entitled to look first to a policy pursuant to which he is an insured; whereas, the priority rules for uninsured motorist ("UM") and UIM benefits require first-priority payments from the insurer of the *motor vehicle* occupied by the claimant. *See id.* (citing 75 Pa.C.S. §§ 1713, 1733).[13] Additionally, while acknowledging that the public policy embodied in the current MVFRL reflects a concern for cost-containment, *id.* at 693 n. 15, the concurring and dissenting judges reasoned that affirmance was nevertheless warranted because the challenged exclusion had been drafted to address a specific risk, payment of only one premium by an insured household which could then attempt to claim coverage for multiple vehicles not insured under the policy, *id.* at 693, and such risk was not implicated by the specific facts of the case. Finally, the concurring and

---

**13.** Section 1713 of the Vehicle Code contains the source-of-benefits priority scheme for defined first-party benefits and provides, *inter alia*, as follows:

(a) General rule.—Except as provided in section 1714 (related to ineligible claimants), a person who suffers injury arising out of the maintenance or use of a motor vehicle shall recover first party benefits against applicable insurance coverage in the following order of priority:

(1) For a named insured, the policy on which he is the named insured.

(2) For an insured, the policy covering the insured.

(3) For the occupants of an insured motor vehicle, the policy on that motor vehicle.

75 Pa.C.S. § 1713(a). Section 1733 establishes the general rule regarding priority of recovery for UM and UIM benefits as follows:

(a) **General rule.**—Where multiple policies apply, payment shall be made in the following order of priority:

(1) A policy covering a motor vehicle occupied by the injured person at the time of the accident.

(2) A policy covering a motor vehicle not involved in the accident with respect to which the injured person is an insured.

75 Pa.C.S. § 1733(a).

dissenting judges found no evidence to support Prudential's claim that voiding the exclusion would increase the cost of automobile insurance premiums. *See id.*

Judge Cavanaugh, joined by Judges Popovich and Johnson, dissented. In the dissent's view, the MVFRL manifests a single public policy—containment of the cost of insurance premiums. *See Burstein,* 742 A.2d at 694–95 (Cavanaugh, J., dissenting). The dissent emphasized that "[t]he *purpose of protecting innocent victims from underinsured motorists* who cannot adequately compensate the victims for their injuries *does not rise to the level of public policy* overriding every other consideration of contract construction." *Id.* at 694–95 (emphasis in original; citation omitted). The dissenters also reasoned that the portability of UIM coverage depended upon the terms of the specific policy; such coverage would thus follow the Bursteins where they had paid premiums for it (for example, if they were injured in one of their own insured vehicles, as pedestrians, or while in an infrequently used substitute or other non-owned car), and would not follow them where they had not (for example, while occupying a regularly used non-owned vehicle). *See id.* at 695. Thus, the dissent concluded that

> [t]o require an insurer to cover a use which is subject to an unambiguous policy exclusion, may almost certainly be expected to give rise to an increase in the cost of automobile insurance. This is violative of public policy. This is the result reached by the majority.

*Burstein,* 742 A.2d at 695 (Cavanaugh, J., dissenting).

This Court granted allocatur primarily to resolve whether enforcement of the regularly used non-owned car exclusion would offend Pennsylvania public policy.

### III. The Parties' Arguments

Referencing the Superior Court dissent, Prudential contends that the overriding policy to be effectuated in construing the MVFRL is the containment of automobile insurance costs to facilitate the offer and procurement of affordable coverage. Prudential asserts that such policy is advanced by enforce-

ment of the regularly used non-owned car exclusion according to its terms, thus limiting insurer risks to those encompassed by written policy provisions against which premiums are measured and collected. Although Prudential concedes that most UIM policies incorporate limited portability aspects, it maintains that such is a function of contractual agreement rather than statutory mandate, determined, from the insurers' perspective, by underwriting experience dictating an appropriate risks/premium exchange. Thus, Prudential disputes the position expressed in the Superior Court lead opinion that UIM coverage by its nature constitutes "first-party coverage," in the sense that it must necessarily follow the person of an insured in all circumstances. Prudential emphasizes that the MVFRL does not expressly prohibit a regularly used non-owned car exclusion or specifically require that insurance policies issued with reference to particular vehicles must also cover all others regularly used by the insured or a household member. While acknowledging that UIM coverage serves the important purpose of compensating victims of underinsured motorists, Prudential cites decisions of this Court determining that such purpose does not rise to the level of a public policy overriding every other consideration of statutory construction. Prudential maintains that, by exposing it and other insurers to risks greater than contemplated by express and unambiguous policy terms, the Superior Court's decision, if sustained, inevitably will result in higher premium charges.

The Bursteins, on the other hand, advance the reasoning employed by the opinions of the common pleas court and the Superior Court lead, highlighting the view that UIM coverage by its nature should be deemed to follow the person of an insured; the liberal compensatory scheme of UIM protection; and the general policy of facilitating the greatest possible coverage to injured claimants. The Bursteins contend that such considerations have been invoked by this Court and the Superior Court to void similar exclusionary provisions, such as the "family car exclusion." *See infra* § I. The Bursteins also emphasize this Court's admonition that public policy impact is to be determined in light of the particular facts presented; in

this regard, the Bursteins point to their purchase of UIM coverage on their own three vehicles, noting further that the decision of Mrs. Burstein's employer not to purchase such coverage for company vehicles was beyond their control. According to the Bursteins, depriving them of UIM benefits in the circumstances would defeat their reasonable expectations concerning coverage that they believed they had obtained, particularly since no valid offer of UIM coverage for a regularly used non-owned car had been made, nor had Prudential obtained an express rejection of such coverage from the Bursteins. Both parties agree that the regularly used non-owned car exception applies by its terms to preclude the Bursteins' recovery of UIM benefits unless contrary to public policy.

## IV. Public Policy

Although arbitration awards generally are substantially insulated from review, as concerns determinations expressly grounded in public policy, this Court's review is plenary in scope. *See Hall,* 538 Pa. at 343, 648 A.2d at 758. This reflects the special character of public policy determinations in an adjudicative setting, a function that is generally reserved for and uniquely suited to the legislative province. In particular, the role of the judiciary in determinations of public policy in the UM/UIM arena has been a subject of controversy in the decisional law across the country, as well as in opinions of the Superior Court and this Court. While credence is almost universally given to the principle that public policy is to be invoked to void an unambiguous contractual provision only in the clearest of cases, courts differ in terms of the manner in which they implement this precept in relation to contractual exclusions from UM/UIM coverage. Such difference is exemplified by the various positions taken in the Superior Court's *Burstein* opinion, with the lead positing that the courts' task is to engage in a balancing of the pertinent policies, *see Burstein,* 742 A.2d at 687 ("[I]t is the duty of this Court to weigh those competing public policy interests and determine which interest prevails under the circumstances presented."), and the dissent rejecting such weighing in favor of the vindication of over-

riding policy. *See Burstein,* 742 A.2d at 694–95 (Cavanaugh, J., dissenting).

In the broadest frame, I deem the dissenting position on this point to be the correct one. This Court has explained that avoidance of unambiguous contractual terms on policy grounds requires the demonstration of an overriding public policy deriving from the laws and legal precedents, long governmental practice, or obvious ethical or moral standards. *See Hall,* 538 Pa. at 347–48, 648 A.2d at 760 (quoting *Muschany v. United States,* 324 U.S. 49, 66–67, 65 S.Ct. 442, 451, 89 L.Ed. 744 (1945)). Furthermore, it is only in cases in which there is a near unanimity of opinion concerning the applicability and importance of the salient policy that such action is to be taken. *See Hall,* 538 Pa. at 348, 648 A.2d at 760 (quoting *Mamlin v. Genoe,* 340 Pa. 320, 325, 17 A.2d 407, 409 (1941)); *see also BLaST Intermediate Unit 17 v. CNA Ins. Cos.,* 544 Pa. 66, 71, 674 A.2d 687, 689 (1996). Where general policy considerations are mixed, courts are not to attempt to discern some incremental balance, but rather, must enforce the contractual undertaking,[14] in the absence of some discrete legal ground supporting avoidance. In the UM/UIM arena, competing policy concerns have been clearly identified—while frequently acknowledging the remedial purposes of the legislatively prescribed offer of UM/UIM insurance, *see, e.g., Paylor,*

---

**14.** In this regard, it is useful to note that respect for agreements to promote stability and certainty in contractual undertakings is one salient policy involved. *See generally Veness v. Midland Risk Ins. Co.,* 732 N.E.2d 209 (Ind.Ct.App.2000) ("Generally, an insurer has the right to limit its coverage of risks and its liability, and in so doing may impose exceptions, conditions, and exclusions upon its contractual obligations which are not inconsistent with public policy.").

The above (textual) limitations are inherent in the judicial function, which is directed to deciding discrete controversies in an adjudicative fashion, rather than to resolution of broad social policy debates. *See generally Pegram v. Herdrich,* 530 U.S. 211, 221–22, 120 S.Ct. 2143, 2150, 147 L.Ed.2d 164 (2000) (describing the legislative process as the "preferable forum for comprehensive investigations and judgments of social value"); *State Farm Mut. Auto. Ins. Co. v. Universal Underwriters Ins. Co.,* 549 Pa. 518, 526, 701 A.2d 1330, 1333–34 (1997) (stating that "[r]eworking the dictates of the MVFRL in order to achieve some ostensibly laudable public policy goal would be a gross intrusion on the Legislature's constitutional powers").

536 Pa. at 587–88, 640 A.2d at 1235–36, the Court has repeatedly emphasized the legislative concern for the increasing cost of insurance as a central policy to be advanced by the MVFRL. *See id.* at 587, 640 A.2d at 1235.[15]

The Superior Court lead opinion also can be viewed in a narrower frame, however. As previously noted, legislative prescriptions such as the MVFRL themselves establish prevailing public policy; accordingly, when a contractual provision contravenes a statute, courts will generally declare the provision void. *See* GEORGE J. COUCH, COUCH ON INSURANCE § 101.15 (3d ed. 2000) ("As statutes and regulations are considered articulations of public policy, a violation of a statute or administrative regulation is also a violation of public policy."). In the insurance setting, a policy of insurance may expand, but cannot reduce, coverage that is mandated by statute—any attempt by an insurer to diminish the statutorily mandated UM/UIM protection (absent an effective rejection by the insured) is void as contrary to public policy.[16] Therefore,

---

**15.** Specifically, the Court has indicated:

> The repeal of the No–Fault Act and the enactment of the MVFRL reflected a legislative concern for the spiraling consumer cost of automobile insurance and the resultant increase in the number of uninsured motorists driving on public highways. The legislative concern for the increasing cost of insurance is the public policy that is to be advanced by statutory interpretation of the MVFRL. This reflects the General Assembly's departure from the principle of "maximum feasible restoration" embodied in the now defunct No Fault Act.

*Paylor*, 536 Pa. at 587, 640 A.2d at 1235; *see also Donnelly*, 553 Pa. at 606, 720 A.2d at 452; *Eichelman*, 551 Pa. at 563, 711 A.2d at 1008; *Rump*, 551 Pa. at 345, 710 A.2d at 1096; *Hall*, 538 Pa. at 348–49, 648 A.2d at 760–61; *Windrim*, 537 Pa. at 135–36, 641 A.2d at 1157–58.

**16.** *See Kmonk–Sullivan v. State Farm Mut. Auto. Ins. Co.*, 746 A.2d 1118, 1121 (Pa.Super.1999) (stating that "[a]s a general rule, stipulations in a contract of insurance in conflict with, or repugnant to, statutory provisions which are applicable to, and consequently form a part of, the contract, must yield to the statute, and are invalid, since contracts cannot change existing statutory laws"), *aff'd*, 567 Pa. 514, 788 A.2d 955 (2001); *see also* COUCH ON INSURANCE 3d § 13.7. *See generally Nationwide Mut. Ins. Co. v. Cosenza*, 258 F.3d 197, 207 (3d Cir.2001) ("While courts do not have a license to rewrite insurance contracts, insurers do not have a right to rewrite or undercut state legislation or policy." (citations omitted)); *Veness*, 732 N.E.2d at 212.

despite the absence of overarching policy extrinsic to the statute, the Bursteins would prevail were they to establish that the regularly used non-owned car exclusion in the UIM portion of the Prudential policy operated to afford less coverage than the General Assembly intended should be made available to them pursuant to Section 1731(c) of the Vehicle Code, *see supra* note 6 and accompanying text, in the absence of an affirmative rejection.

For purposes of determining the meaning of the UIM provisions of the MVFRL (and correspondingly whether public policy is violated by the regularly used non-owned car exclusion), more general policies such as the remedial purposes of the offer of UIM insurance (the legislative intent of UM/UIM statutes as a protective measure for victims of uninsured and underinsured motorists) again become relevant as a means of assessing legislative intent. *See* 1 Pa.C.S. § 1921 (enumerating tools of statutory construction, including reference to the circumstances under which a statute was enacted; the mischief to be remedied; the object to be attained; and the consequences of a particular interpretation). It is crucial, however, to distinguish between reference to public policy as a means to determine the intent underlying a statute, and the direct application of overarching public policy to invalidate a contractual provision. In the former circumstance, the policy may inform the manner in which the statute is applied to the facts and circumstances of an individual case; it is only in the latter circumstance that the individual facts and circumstances are evaluated in direct relation to the overarching policy that has been discerned. While this distinction may seem to be a fine one, its observance prevents courts from disrupting broad social policy established by the General Assembly by directing the results of individual cases according to their own individual notions concerning which policies should prevail in any given set of circumstances.[17]

17. *See Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 487, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955) (noting that it is the function of the legislature, not the courts, to balance advantages and disadvantages); *see also Gregg v. Georgia*, 428 U.S. 153, 175, 96 S.Ct. 2909, 2926, 49 L.Ed.2d 859 (1976) (courts are not representative bodies and

For example, as pertains to UM/UIM coverage questions in particular, this Court has cautioned that the general remedial purposes "do[ ] not rise to the level of public policy overriding every other consideration of statutory construction." *Hall,* 538 Pa. at 348, 648 A.2d at 760–61; *see also Eichelman,* 551 Pa. at 566, 711 A.2d at 1010.

Thus, even in the narrower frame, the Superior Court's approach of looking to the Bursteins' individual situation to determine whether public policy would be advanced in the individual facts and circumstances of the case was an incorrect one. Nevertheless, in the course of its discussion, the Superior Court lead identified several policies relevant to the construction of the MVFRL, including the liberal compensatory scheme of the MVFRL, the public interest in providing UIM insurance, and, correspondingly, the core conclusion that the legislative conception requires that the coverage follow the person of the insured except in limited circumstances. *See Burstein,* 742 A.2d at 688 ("if an individual purchases underinsured motorist coverage, that individual will be protected from negligent drivers with inadequate coverage regardless of the vehicle in which he or she happens to be injured"). The dissent, on the other hand, took the position that the General Assembly intended to leave portability entirely to the contracting parties. *See Burstein,* 742 A.2d at 695 ("The concept of portability of underinsured motorist coverage is rooted in an interpretation of the particular insurance policy at issue."). In my view, the specific question at the center of this appeal is whether the General Assembly intended to incorporate a fixed concept of portability into the statute, thus foreclosing the employment of geographic exclusions such as the regularly used non-owned car exclusion.

In interpreting similar financial responsibility schemes, many courts have adopted the position taken by the Superior Court lead and, accordingly, have invalidated various geographic exclusions. For example, in *Calvert v. Farmers Ins.*

must not usurp the legislative function (citation omitted)); *Griswold v. Connecticut,* 381 U.S. 479, 482, 85 S.Ct. 1678, 1680–81, 14 L.Ed.2d 510 (1965) (courts are not super-legislatures).

*Co. of Arizona,* 144 Ariz. 291, 697 P.2d 684 (1985), the court discerned

> nothing in our uninsured motorist statute which limits coverage depending on the location or status of the insured. Thus, our uninsured motorist protection is portable.... Any gaps in uninsured motorist protection dependent on location of the insured should be sanctioned by the Legislature and not by this Court.

*Id.* at 689; *see also Howell v. Balboa Ins. Co.,* 564 So.2d 298 (La.1990) ("The courts of this state have recognized, both impliedly and explicitly, that this coverage cannot be qualified by a requirement of a relationship with an insured vehicle.") *See generally Nationwide Mut. Ins. Co. v. Hampton,* 935 F.2d 578, 584–85 & n. 5 (3d Cir.1991) (observing that "[t]he highest court of 27 other states, and intermediate appellate courts in another four, have declared [other owned vehicle/household family member] clauses invalid" (citing cases)).[18] In such decisions, the remedial purposes of the statute and the corresponding policy of liberal construction are frequently para-

---

**18.** *Accord Nationwide Mut. Ins. Co. v. Mabe,* 342 N.C. 482, 467 S.E.2d 34, 43 (1996) (stating that "in applying the Financial Responsibility Act to insurance policies, liability insurance is 'vehicle oriented' and UIM coverage is 'person oriented' "); *Martin v. Midwestern Group Ins. Co.,* 70 Ohio St.3d 478, 639 N.E.2d 438, 441-42 (1994) (invalidating other owned vehicle/household family member exclusion (superseded by statute)); *Monteith v. Jefferson Ins. Co. of N.Y.,* 159 Vt. 378, 618 A.2d 488, 490 (1992) (stating that "the essence of UM/UIM coverage ... is its portability[;] [t]he statute does not allow insurers to condition coverage on the location of the insured nor the insured's status as a motorist, a passenger in a private or public vehicle, or a pedestrian"); *Howell,* 564 So.2d at 301 ("UM coverage attaches to the person of the insured, not the vehicle"); *Chaffin v. Kentucky Farm Bureau Ins. Cos.,* 789 S.W.2d 754, 757 (Ky.1990); *Bradley v. Mid-Century Ins. Co.,* 409 Mich. 1, 294 N.W.2d 141, 152 (1980) (indicating that a person is an insured if the person is injured by an uninsured motorist regardless of whether the person is "in an owned vehicle named in the policy, in an owned vehicle not named in the policy, in an unowned vehicle, on a motorcycle, on a bicycle, whether afoot or on horseback or even on a pogo stick"); *Farmers Ins. Co. v. Gilbert,* 14 Kan.App.2d 395, 791 P.2d 742, 746, *aff'd,* 247 Kan. 589, 802 P.2d 556 (1990). *See generally* Annotation, *Uninsured Motorist Coverage: Validity of Exclusion of Injuries Sustained by Insured While Occupying "Owned" Vehicle Not Insured By Policy,* 30 A.L.R.4th 172 (1984).

mount considerations,[19] and the absence of language in the statute explicitly allowing for such exclusions also is frequently noted.[20] Reference is also sometimes made to specific character attributes of UM and UIM insurance, *see supra* notes 3–7 and accompanying text, in light of which some courts have concluded that portability does not place an unreasonable burden on the insurer. *See generally* ALAN I. WIDISS, UNINSURED AND UNDERINSURED MOTORIST COVERAGE 2d (rev.) § 4.19 (1999).

Conversely, other courts have enforced various geographic exclusions, frequently emphasizing that the purpose of the financial responsibility laws is to encourage owners of uninsured vehicles to purchase insurance and stressing the absence of express legislative limitations on exclusions. *See, e.g., Clampit v. State Farm Mut. Auto. Ins. Co.,* 309 Ark. 107, 828 S.W.2d 593, 596 (1992) (indicating that, "if appropriate exclusions are not upheld, the substantially increased risk of an owned-but-not-insured vehicle becomes a 'free ride' by the insured because the insurer would be paying benefits on the second vehicle for which it received no premiums" (citation omitted)).[21] Some courts have indicated that invalidation of

19. *See, e.g., Frank v. Horizon Assurance Co.,* 553 A.2d 1199, 1202 (Del.1989) ("An apparent majority of jurisdictions which have addressed the issue support the view that [other owned vehicle/household family member] exclusions are incompatible with statutorily created uninsured motorist insurance, because the insurance is personal to the insured, and public policy prohibits the limiting of this coverage based on the manner in which the insured is injured."); *Fernandez v. Selected Risks Ins. Co.,* 82 N.J. 236, 412 A.2d 755, 757 (1980) ("[d]efendant's attempt to restrict the scope of its liability under the [UM provisions of its] insurance contract, which it has made available to its insureds, weakens the statutory objective of encouraging full protection against uninsured and financially irresponsible drivers").

20. *See, e.g., Calvert,* 697 P.2d at 687 (stating that, "if the Legislature had intended to include additional exclusions, such as an 'other vehicle' exclusion, it would have expressly done so"); *State Farm Mut. Auto. Ins. Co. v. Hinkel,* 87 Nev. 478, 488 P.2d 1151, 1153 (1971) (indicating that "it is not the intent of the legislature to require the insurer to offer protection with one hand and then take a part of it away with the other").

21. *Accord Wintz v. Colonial Ins. Co. of Cal.,* 542 N.W.2d 625 (Minn. 1996) (stating that "[t]o void an exclusionary clause where the vehicle was 'owned by or furnished or available for the regular use of' the first-

geographic exclusions would expose insurers to unassessed risks. *See, e.g., Clampit,* 828 S.W.2d at 597 (noting that the other owned vehicle/household family member exclusion "excludes a material, unassumed risk for which the insurance company could be expected to charge a higher premium, and it would be unfair to ask other insureds to share the cost of the increased exposure").[22] *See generally* JOHN A. APPLEMAN & JEAN A. APPLEMAN, INSURANCE LAW AND PRACTICE § 5078.15 (1981 & Supp.2001) (observing that "[i]t is scarcely the purpose of any insurer to write a single [UIM] coverage upon one of a number of vehicles owned by an insured, or by others in the household, and extend the benefits of such coverage gratis upon all other vehicles—any more than it would write liability, collision or comprehensive coverages [on such a basis]").

Further, the positions taken by various jurisdictions have changed with the evolution of financial responsibility laws. For example, prior to 1985, Minnesota courts strongly disapproved geographic exclusions—in *Nygaard v. State Farm Mut. Auto. Ins. Co.,* 301 Minn. 10, 221 N.W.2d 151 (1974), the

party beneficiary would allow a policyholder to insure only one vehicle, and gain coverage on any/all other uninsured vehicles"); *Union Ins. Co. v. Stanage,* 454 N.W.2d 736, 738 (S.D.1990); *Dullenty v. Rocky Mountain Fire & Cas. Co.,* 111 Idaho 98, 721 P.2d 198, 202 (1986) (finding "no legislative intent one way or the other" expressed on the question of whether other owned vehicle/household family member exclusions should be enforced, and concluding that the legislature would have specified that exclusionary clauses are unenforceable if it so intended), *overruled on other grounds, Colonial Penn Franklin Ins. Co. v. Welch,* 119 Idaho 913, 811 P.2d 838 (1991). *See generally Hampton,* 935 F.2d at 586–87 (citing cases).

**22.** The *Clampit* court framed its risk assessment as follows:

a person is more likely to be occupying an owned vehicle than he is to be occupying a vehicle owned by someone else. Hence, an insurance carrier may be willing to assume risks which it perceives as relatively slight, i.e., being damaged by an uninsured motorist while occupying a non-owned vehicle, without an increase in premium. It might be unwilling to insure against a risk it perceives as substantial without an increase in premium. If an insurer is required to insure against a risk of an undesignated but owned vehicle ... it is thereby required to insure against risks of which it is unaware, unable to underwrite, and unable to charge a premium for.

*Clampit,* 828 S.W.2d at 596 (quoting *Dullenty,* 721 P.2d at 206).

Minnesota Supreme Court stated that Minnesota's uninsured motorist statute

places no geographical limits on coverage and does not purport to tie protection against uninsured motorists to occupancy of the insured vehicle . . .

. . . "[U]ninsured motorist protection is not coverage for vehicles but persons, even though it is contained in an insurance policy otherwise insuring an automobile." If our interpretation of the intent of the uninsured-motorist statute is correct, little room is left for an insurer unilaterally to narrow the geographic scope of the statutorily required coverage.

*Id.* at 156–57 (citations omitted). *See generally* Smetak, *Underinsured Motorist Coverage in Minnesota*, 24 WM. MITCHELL L.REV. at 906 ("[b]efore October 1, 1985, Minnesota courts consistently refused to enforce policy exclusions which prevented UM and UIM coverages from following the person rather than the vehicle"). In 1985, the Minnesota legislature amended the Minnesota uninsured motorist statute to include a geographic limitation and to designate the occupied motor vehicle as the primary source of UM or UIM coverage, which the Minnesota Supreme Court interpreted as "reflect[ing] a broad policy decision to tie uninsured motorist and other coverage to the particular vehicle involved in an accident." *Hanson v. American Family Mut. Ins. Co.*, 417 N.W.2d 94, 95–96 (Minn.1987). *See generally* Smetak, *Underinsured Motorist Coverage in Minnesota*, 24 WM. MITCHELL L.REV. at 935 (describing the legislative purposes of the 1985 amendments as "to allow individuals to select their own level of available insurance protection, (protection which was tied to the vehicle) and to prevent the shifting of insurance from one vehicle to another"). As summarized by one commentator:

Before the 1985 statutory changes to the UM/UIM system, both UM and UIM policies were deemed to essentially follow the person and not the vehicle. Thus, before 1985 Minnesota law allowed the "stacking" of all UM or UIM coverages available to a person under several potentially available policies. At some point, however, these policy

objectives shifted; allowing recovery of the UM or UIM coverage became unacceptable.

Minnesota's UIM history, in terms of its application to the family auto exclusion, shows the struggle as the courts have tried to apply these shifting policies. More recently, the appellate courts have come to recognize that the post–1985 statutes not only validate the family auto exclusions, but impose the limitation even in the absence of an exclusion or limitation in the insurance policy.

Smetak, *Underinsured Motorist Coverage in Minnesota,* 24 Wm. Mitchell L.Rev. at 891.

In Pennsylvania, the treatment of geographic exclusions, and, correspondingly, the judicial understanding of portability, has undergone a similar evolution. As previously noted, in December of 1963, following the enactment of the Uninsured Motorist Act, the Insurance Department promulgated title 31, chapter 63 of the Pennsylvania Code pursuant to its authority under the Commonwealth Documents Act. Section 63.2 provided that "[t]he extent of coverage which shall be offered as "Uninsured Motorist Coverage" shall be at least that coverage contained in the sample form in Exhibit C, which is the National standard form for this insurance." 31 Pa.Code § 63.2. Originally, the sample form contained an other owned vehicle/household family member exclusion.[23] However, in *Bankes v. State Farm Mut. Auto. Ins. Co.,* 216 Pa.Super. 162, 264 A.2d 197 (1970), the Superior Court expressed the belief that such exclusion was invalid as contrary to the intent of the UM Act, *see id.* at 167–68, 264 A.2d at 199–200, and in *Wilbert v. Harleysville Mut. Ins. Co.,* 254 Pa.Super. 217, 385 A.2d 987 (1978), the Superior Court affirmatively held that the exclu-

---

**23.** The sample form provided:

This endorsement does not apply:

\* \* \*

(b) to bodily injury to an insured while occupying an automobile (other than an insured automobile) owned by a named insured or any relative resident in the same household, or through being struck by such an automobile, but this exclusion does not apply to the principal named insured or his relatives while occupying or if struck by an automobile owned by an insured named in the schedule or his relatives[.]

31 Pa.Code § 63.2, Exhibit C (superseded).

sion was impermissible. *See id.* at 224–25, 385 A.2d at 991. In so holding, the court placed substantial reliance upon the General Assembly's rejection of a statutory other owned vehicle/household family member exclusion in connection with the enactment and amendment of the UM Act. *See id.* at 224, 385 A.2d at 990–91. The Superior Court also relied upon the decisions of other jurisdictions which had deemed similar exclusions violative of the purposes of the uninsured motorist statutes. *See id.* Following *Wilbert,* this Court issued *State Farm Mut. Auto. Ins. Co. v. Williams,* 481 Pa. 130, 392 A.2d 281 (1978), in which it also invalidated an other owned vehicle/household family member exclusion in UM provisions on grounds of public policy. *See id.* at 143, 392 A.2d at 287. The Court noted the mandatory nature of UM insurance and the obligation of the insurer to compensate the insured for damages inflicted by reason of an uninsured motorist, except under three express statutory exclusions.[24] The Court described the statute as "mandat[ing] a floor of minimum protection to be afforded to the owner/operator of a motor vehicle within the Commonwealth" and indicated that "the statute does not permit a diminution of that protection below the statutory limits." *Williams,* 481 Pa. at 139–40, 392 A.2d at 285.

Following *Wilbert* and *Williams,* the Insurance Department amended its sample form in accordance with the provisions of the Commonwealth Documents Law, 45 P.S. §§ 1201–1208, to omit the other owned vehicle/household family member exclusion. The Insurance Department cited *Wilbert* and certified that the amendment was necessary and appropriate for the

**24.** Under the UM Act, the statutory exclusions were:

1. Property damage.

2. Bodily injury damages when the insured or his representative has without written consent of the insurance carrier settled or prosecuted to judgment any action against any person or persons liable for such injuries.

3. Any damage, the payment of which would be for the direct or indirect benefit of a workmen's compensation carrier or any person who would qualify as a self-insurer under any workmen's compensation law.

*Williams,* 481 Pa. at 139, 392 A.2d at 285 (citing 40 P.S. § 2000 (superseded)).

administration and enforcement of the authorizing statutes. *See* 9 PA. BULLETIN 152 (Jan. 12, 1979). As a consequence, the Insurance Department affirmatively mandated UM coverage for other owned vehicles, since its regulations required at least the coverage provided in the revised sample form. *See* 31 PA.CODE § 63.2.

Subsequently, in a line of cases concerning the family car exclusion, the Superior Court endorsed the view that UM and UIM coverage is, by legislative design, portable; therefore, the family car exclusion was invalid, except in limited circumstances in which the insured was attempting to utilize the coverage effectively as a substitute for more expensive liability coverage. *See Marroquin*, 404 Pa.Super. at 455–56, 591 A.2d at 296–97; *Sherwood v. Bankers Standard Ins. Co.*, 424 Pa.Super. 13, 23, 621 A.2d 1015, 1020–21 (1993), *rev'd per curiam*, 538 Pa. 397, 648 A.2d 1171 (1994); *Cooperstein v. Liberty Mut. Fire Ins. Co.*, 416 Pa.Super. 488, 498, 611 A.2d 721, 726–27 (1992); *Kelly v. Nationwide Ins. Co.*, 414 Pa.Super. 6, 19, 606 A.2d 470, 476 (1992); *Caldararo v. Keystone Ins. Co.*, 393 Pa.Super. 103, 109–10, 573 A.2d 1108, 1111–12 (1990); *Wolgemuth*, 370 Pa.Super. at 60, 535 A.2d at 1150.[25] Several of these decisions relied expressly upon the view espoused by Minnesota courts that UM and UIM coverage is of a first-party nature in the sense that it follows the person rather than the vehicle. *See Marroquin*, 404 Pa.Super. at 455–56, 591 A.2d at 296–97 (citing *DeVille v. State Farm Mut. Auto. Ins. Co.*, 367 N.W.2d 574 (Minn.App.1985)); *Caldararo*, 393 Pa.Super. at 109–10, 573 A.2d at 1111–12; *Wolgemuth*, 370 Pa.Super. at 60, 535 A.2d at 1150 (citing *Myers v. State Farm Mut. Auto. Ins. Co.*, 336 N.W.2d 288, 291 (Minn.1983)).[26]

In this Court's 1994 decision in *Paylor*, 536 Pa. at 583, 640 A.2d at 1234, a case also involving the family car exclusion,

**25.** The primary decisions from this line are discussed at length in *Paylor*, 536 Pa. at 588–95, 640 A.2d at 1236–40.

**26.** Prudential cites *Insurance Co. of N. Am. v. Hippert*, 354 Pa.Super. 333, 511 A.2d 1365 (1986), and *State Farm Mut. Auto. Ins. Co. v. Brnardic*, 441 Pa.Super. 566, 657 A.2d 1311 (1995), for the proposition that the Superior Court rejected the rationale that UM/UIM coverage generally follows the person of the insured. These cases, however, pertain to liability insurance coverage and thus have little relevance to

this Court appeared to endorse the Superior Court's prevailing view, citing affirmatively to *Marroquin*, *Newkirk*, and *Wolgemuth*, as well as to early Minnesota precedent. *See Paylor*, 536 Pa. at 592–95, 640 A.2d at 1238–40. The Court described a general rule that contractual provisions such as the family car exclusion "are invalid as against the policy of the MVFRL." *See id.* at 595, 640 A.2d at 1240 (citing *Sherwood*, 424 Pa.Super. at 17, 621 A.2d at 1017). One month after issuance of *Paylor*, however, this Court upheld the validity of an other owned vehicle/household family member exclusion in a policy of UM insurance in *Windrim*, 537 Pa. at 129, 641 A.2d at 1154.[27] The Court did not discuss the Minnesota position or the general concept of portability which it appeared to endorse in *Paylor*, but rather, alluded to the cost containment rationale. The Court's central rationale was as follows:

> the Superior Court's prevailing interpretation of UM/UIM cases in the relevant time frame. *See generally Prudential Property and Cas. Ins. Co. v. Gisler*, 764 A.2d 1111, 1114 (Pa.Super.2000).
>
> It should be acknowledged that the Superior Court has approved a number of other forms of exclusion not specifically delineated in the MVFRL. For example, in *Marino v. General Accident Ins. Co.*, 416 Pa.Super. 1, 610 A.2d 477 (1992), the court upheld an exclusion of UM/UIM insurance coverage when the insured vehicle was operated to transport persons or goods for a fee. *See id.* at 8, 610 A.2d at 480–81. The supporting rationale included the observation that the MVFRL does not contain a list of permissible exclusions and reliance upon the cost containment concern motivating the enactment of and amendments to the MVFRL. *See id.* at 7, 610 A.2d at 479–80; *see also Nationwide Mut. Ins. Co. v. Cummings*, 438 Pa.Super. 586, 595, 652 A.2d 1338, 1344–45 (1994) (validating non-permissive use exclusion with reference to cost containment rationale); *Frazier v. State Farm Mut. Auto. Ins. Co.*, 445 Pa.Super. 218, 221–22, 665 A.2d 1, 2–3 (1995) (same); *cf. Jeffrey*, 423 Pa.Super. at 502, 621 A.2d at 645 (upholding, with strong emphasis on the cost containment rationale, a setoff provision in which any recovery by a guest passenger under the liability provisions of the policy was to be set off against financial recovery under the UM provision of the policy).

27. In *Windrim*, the plaintiff was injured by an unidentified motorist while driving his own uninsured vehicle. He therefore sought coverage under his mother's policy, which contained an other owned vehicle/household family member exclusion. *See Windrim*, 537 Pa. at 130, 641 A.2d at 1155.

[T]he legislative history of the MVFRL indicates that the primary concerns of the General Assembly in repealing the No-fault Act and enacting the MVFRL were the spiraling cost of automobile insurance and the resultant increase in the number of uninsured motorists driving on public highways.

We therefore hold that the [other owned vehicle/household family member] exclusion . . . is a valid and enforceable provision. Our conclusion is bolstered by the fact that Windrim's argument, if accepted, would actually contravene the legislative intent behind the MVFRL by serving as a disincentive to insure vehicles. As Judge Popovich observed, "[a] possible result . . . is that many individuals owning several vehicles will purchase coverage for only one of them. Likewise, relatives living with an insured will be less inclined to purchase insurance for their vehicles, instead seeking uninsured motorist coverage under their relative's insurance policy." Clearly, the General Assembly did not envision nor intend such abuses of the system when it enacted the MVFRL.

*Windrim,* 537 Pa. at 136, 641 A.2d at 1158 (citations omitted).[28] Three months after issuance of *Windrim,* this Court issued a *per curiam* order reversing the Superior Court's decision in *Sherwood,* which had invalidated a family car exclusion, with citation to *Paylor. See Sherwood v. Bankers Standard Ins. Co.,* 538 Pa. 397, 648 A.2d 1171 (1994).

**28.** This rationale was echoed in the concurring opinion filed by Mr. Justice Cappy as follows:

> Viewing the exclusion at issue here, I am constrained to conclude that it is entirely consistent with the public policy underlying the enactment of the MVFRL and therefore, is valid and enforceable. There is no question that by being denied coverage, Windrim will be induced to purchase the mandated automobile insurance for his registered automobiles. In addition, it is axiomatic that the cost of insurance will be reduced as a result of providers not having to pay benefits to uninsured persons who have failed to comply with the law and thereby failed to contribute to the resources necessary for a comprehensive insurance program. Both the insurance company and the insured have recognized this public policy in negotiating the contractual exclusion.

*Windrim,* 537 Pa. at 142, 641 A.2d at 1161 (Cappy, J., concurring).

The view that the General Assembly incorporated a fixed concept of portability into the MVFRL was further eroded by the reasoning contained in the Court's decision in *Hall v. Amica Mut. Ins. Co.*, 538 Pa. 337, 648 A.2d 755 (1994). In *Hall*, the plaintiff challenged, on public policy grounds, a territorial limitation in UM provisions of an automobile insurance policy.[29] In rejecting such challenge, the Court extensively criticized the notion that the MVFRL should be read as incorporating a general portability aspect, characterizing such a position as an example of logical fallacy and circular reasoning, as it does not derive expressly from the terms of the statute. *See id.* at 344, 346, 648 A.2d at 758–59.[30] Further, the Court emphasized:

> Although uninsured motorist coverage serves the purpose of protecting innocent victims from irresponsible uninsured motorists, that purpose does not rise to the level of a public policy overriding every other consideration of statutory construction. Not to lose sight of the forest for the trees, we quote the obvious: "[T]he policy of liberal interpretation of the [uninsured motorist law] is not limitless, a proverbial House that Jack Built. . . . [T]here is a correlation between the premiums paid by the insured and the coverage a claimant could reasonably expect to receive."

*Hall*, 538 Pa. at 348–49, 648 A.2d at 760–61 (quoting *Jeffrey*, 423 Pa.Super. at 501–02, 621 A.2d at 645).[31] The Court did not expressly attempt to resolve the potential conflict of its rea-

---

**29.** The provision unambiguously limited the territory of coverage to the United States, its territories and possessions, Puerto Rico, and Canada. *See Hall*, 538 Pa. at 339–40, 648 A.2d at 756.

**30.** This reasoning is opposite that applied by many jurisdictions which have endorsed the principle that coverage follows the person, as they reason that the legislative body would have expressly provided for exclusions if it had intended them to be available. *See supra* note 21 and accompanying text.

**31.** The Court also indicated that:

> [t]he Pennsylvania Insurance Commission, responsible to implement the statute, has promulgated regulations permitting the territorial limitation at issue in this case. *See* 31 Pa.Code §§ 63.3(a), 63.2 (requiring coverage only "within the United States, its territories and

soning with the Minnesota position that UM and UIM coverage follows the person of the insured which was cited affirmatively in *Paylor.* *Cf. Monteith,* 618 A.2d at 490–91("If our interpretation of the intent of the uninsured-motorist statute is correct, little room is left for an insurer unilaterally to narrow the geographic scope of the statutorily required coverage." (quoting *Nygaard,* 221 N.W.2d at 157)).

The next year (1995), this Court reversed a memorandum decision of the Superior Court which had invalidated an other owned vehicle/household family member exclusion in a UIM policy. *See Hart v. Nationwide Ins. Co.,* 541 Pa. 419, 663 A.2d 682 (1995). As reflected in Mr. Justice Cappy's dissenting statement, the Court's order reflected an extension of *Windrim's* reasoning from a situation in which the plaintiff was driving an uninsured vehicle, to one in which the plaintiff was driving a vehicle carrying liability coverage, but as to which UM and UIM coverage had been rejected. *See Hart,* 541 Pa. at 421, 663 A.2d at 682–83 (Cappy, J., dissenting).

In 1998, this Court issued *Eichelman,* 551 Pa. at 558, 711 A.2d at 1006, essentially reaffirming the holding and reasoning of *Windrim,* with additional emphasis on the cost containment rationale.[32] The Court expressly acknowledged that its decisions in *Eichelman* and *Windrim* "expanded the applicability of the 'household exclusion,'" *see Eichelman,* 551 Pa. at 565, 711 A.2d at 1009, and thus represented a material change in the substantive law pertaining to UM and UIM coverage. *See also Windrim,* 537 Pa. at 135, 641 A.2d at 1157 (indicating that the Superior Court's *Bankes* decision (which concluded that the other owned vehicle/household family member exclusion was invalid) no longer represented prevailing authority in light of the policy changes implemented through the MVFRL).

Canada"). The form of the policy issued by [the insurer] was submitted to and approved by the insurance commissioner. We regard this factor as a significant one.
*Hall,* 538 Pa. at 347, 648 A.2d at 760.

**32.** In *Eichelman,* the plaintiff was injured while riding his motorcycle, which, while insured, did not carry UIM coverage. Claiming that the other driver's liability insurance was insufficient, the plaintiff sought to recover UIM benefits from his mother's policy and her husband's policy. *See Eichelman,* 551 Pa. at 560–61, 711 A.2d at 1007.

218

Whereas the Court in *Hall* indicated that the Insurance Department's express inclusion of a territorial exclusion in its sample form establishing the minimum permissible coverage was a substantial factor in its analysis, *see supra* note 31, the Court in *Windrim* and *Eichelman* did not reference the fact that the Insurance Department had eliminated the other owned vehicle/household family member exclusion from the sample form pertaining to UM insurance.

The Bursteins cogently argue that, in enacting and amending the MVFRL, the General Assembly did not manifest an intent to alter its own pre-existing conception of the fundamental nature of UM and UIM coverage, but rather, merely made such coverage optional.[33] Nevertheless, this Court's decisions reflect a substantially changed construction grounded largely upon the legislative concern with cost containment which motivated the MVFRL and its subsequent amendments. *Compare, e.g., Eichelman,* 551 Pa. at 564, 711 A.2d at 1008–09, *with Williams,* 481 Pa. at 139–40, 392 A.2d at 285, and *Wilbert,* 254 Pa.Super. at 224–26, 385 A.2d at 991–92.[34] How-

33. Prior to the passage of the MVFRL, this Court had essentially endorsed the Bursteins' position on this point, as follows:

[W]e are not impressed by [the insurer's] argument that the Pennsylvania statute must be distinguished, as to its intent, from others, by reason of the fact that our act permits the insured to reject uninsured motorist coverage. While the coverage may be rejected, it must be noted that the carrier is required to include it in every policy, and only an affirmative written rejection is effective. We are convinced that the overriding interest of the legislation was to provide the coverage without positively forcing it down the throat of the insured. *Harleysville Mut. Cas. Co. v. Blumling,* 429 Pa. 389, 395, 241 A.2d 112, 115 (1968). Various Superior Court decisions would extend the logic to the MVFRL. *See, e.g., Marroquin,* 404 Pa.Super. at 451, 591 A.2d at 294 (stating that "the language in the Uninsured Motorist Act was considered by the Pennsylvania Supreme Court when it declared that the act was to be interpreted as having a liberally compensatory intent[;][t]hat this language is preserved in the new law indicates the drafters' intention that the Financial Responsibility Law be construed in the same fashion" (citation omitted)). *But see Hampton,* 935 F.2d at 588 (predicting that this Court would decline to follow the Superior Court's decisions in *Wilbert* and *Banks* in light of the intervening policy of the MVFRL).

34. There is considerable weight to the position that, once a reasonable construction of a statute is discerned, the preferable course is for this

ever, just as the remedial purposes of the required offer of UM and UIM coverage cannot be relied upon to the exclusion of every other principle of statutory construction, see *Hall*, 538 Pa. at 348–49, 648 A.2d at 760–61, the same can be said of the cost containment rationale.[35] Therefore, it is in my view important to recognize that insurers do not possess unbridled authority to include any and all forms of geographic exclusions in UM and UIM coverage according to their own individual notions of appropriate business purposes. There should be limiting principles.

Primarily, I would discern a central limiting principle in the Insurance Department's regulatory role. Pursuant to the MVFRL, the Department is expressly charged with administration and enforcement and empowered with the authority to make substantive rules and regulations necessary to these ends. *See* 75 Pa.C.S. § 1704(b).[36] In furtherance of its substantial responsibilities, the Department is also empowered to monitor insurers' profits, undertake conjunctive analysis of

Court to maintain the construction consistently, requiring the General Assembly to act expressly to create a modified paradigm (as was the experience in Minnesota, *see supra*).

**35.** The Superior Court lead's observation in this regard is creditable, *see Burstein*, 742 A.2d at 689 (stating that "[i]f we were to adopt [Prudential's] logic [predicated on cost containment], this [c]ourt would never be able to find an exclusion void on the basis that it violated public policy"), as is the Superior Court's separate observations that cost containment is primarily a means to an end, namely, the conferral of reasonably priced insurance protection upon Pennsylvania citizens. *See, e.g., Allwein*, 448 Pa.Super. at 377, 671 A.2d at 751 (stating that "while 'maximum feasible restoration' may have passed out of favor the basic theory behind automobile insurance surely has not[;][t]he policy of liberally construing the MVFRL is based upon the policy of indemnifying victims of accidents for a harm they suffer on Pennsylvania highways"). *See generally* WIDISS, UNINSURED AND UNDERINSURED MOTORIST INSURANCE § 35.4, at 165 ("[i]n every state there is a general public interest in providing indemnification to individuals who have been injured in motor vehicle accidents"). Indeed, this Court recently expressed similar sentiments in *Lewis*, 568 Pa. at 119–20, 793 A.2d at 151–52; in light of such reasoning, I differ with the majority's decision to perpetuate the characterization of the cost containment policy as overarching.

**36.** Similarly, in the UM Act, the Legislature specified that coverage be provided under "provisions approved by the Insurance Commissioner." 40 P.S. § 2000.

market studies and random field surveys, and pursue other forms of investigation. *See* 75 Pa.C.S. §§ 1799.5, 1799.6. Unlike this Court, therefore, the Department has been vested with the tools necessary to verify that any impact upon the remedial purposes of the MVFRL occasioned by contractual exclusions is a reasonably justified implement of cost containment in light of industry experience and other salient factors.

Through this Court's decision in *Paylor*, this Court's interpretations created uncertainty in terms of the Insurance Department's ability to promulgate regulations formally authorizing geographic exclusions; indeed, as noted, following the Superior Court's decision in *Wilbert* and this Court's in *Williams*, the Insurance Department withdrew its formal authorization of other owned vehicle/household family member exclusions in the UM context. *See supra.* As noted, this case presents an opportunity to ameliorate such uncertainty by clarifying and correcting the Court's decisional law in light of the prevailing understanding of the MVFRL. In furtherance of both the remedial purposes and cost containment objectives, I would therefore expressly recognize that the General Assembly left significant room for administrative adjustment in terms of defining permissible UM and UIM geographic coverage exclusions, and clarify that the Department's validly enacted substantive rules in the UM/UIM arena (namely, those enacted pursuant to the Commonwealth Documents Law and within the scope of the delegated authority) [37] should carry the force and effect of law pursuant to the usual presumption of reasonableness and validity. *See Borough of Pottstown v. Pennsylvania Mun. Retirement Bd.*, 551 Pa. 605, 609–10, 712 A.2d 741, 743 (1998). In answer to the specific question presented in this case, I would conclude that the General Assembly did not intend to incorporate a fixed concept of portability into the UM/UIM provisions of the MVFRL, but rather, envisioned that the Department would play a significant role in terms of promulgating and enforcing specific required attributes for UM and UIM coverage.

37. In these respects, it is noteworthy that the authority of the Insurance Department is not unfettered.

This reasoning, however, would not entirely resolve the dispute in this case, since the Department has in fact promulgated regulations, *see* 31 Pa.Code § 63.2, which do not authorize a general regularly used non-owned car exclusion.[38] *Cf. Hall,* 538 Pa. at 347, 648 A.2d at 760 (regarding the Department's regulation approving a territorial exclusion as a significant factor in the Court's rejection of a public policy challenge to such exclusion). Although such regulations were promulgated pursuant to the Department's authority under the UM Act and expressly pertain to UM coverage, the regulations remain extant, and I discern no salient policy that would distinguish UIM from UM coverage in terms of the viability of such an exclusion.[39] Concededly, *Windrim* and *Eichelman* both approved other owned vehicle/household family member exclusions that are not authorized by Section 63.2. However, I find it significant that the Department's decision to eliminate the other owned vehicle/household family member exclusion from the approved form defining the minimum authorized coverage was expressly predicated upon judicial decisions which are no longer valid in light of this Court's present interpretation of the MVFRL. *See Windrim,* 537 Pa. at 135, 641 A.2d at 1157 (recognizing the effective overruling of *Bankes* ). On the other hand, the Department's regulations do not appear to have ever authorized a general, regularly used non-owned car exclusion in any context. While, again, the then-extant judicial opinions may have influenced the Department's decision not to attempt to formally modify its regulations as insurance companies gained sophistication and attempted to create additional geographic exclusions tailored to specific circumstances, there is no apparent basis upon which to predicate an affirmative conclusion in this regard. Although certainly the Department's general regulatory ap-

**38.** The regulation does effectively allow for a limited regularly used non-owned car exclusion pertaining to persons who are not named insureds or household family members. *See* 31 Pa.Code § 63.2, Exhibit C § II(b)(3)(iv). Such exclusion, however, would be inapplicable in the Bursteins' situation, as they were named insureds on the Prudential policy.

**39.** In this regard, Prudential's policy includes the regularly used non-owned car exclusion in both the UM and UIM portions of the coverage.

proval of UM and UIM policies which contain the exclusion constitutes some evidence of the Department's intent, this is an insufficient basis for overlooking a formal, substantive regulation expressly delineating required minimum coverage. *Cf. City of Philadelphia v. Fraternal Order of Police, Lodge No. 5*, 132 Pa.Cmwlth. 631, 574 A.2d 123 (1990) (stating that the mere announcement of new policy does not amount to adoption of regulation or effect amendment of governing regulation; proper promulgation of regulation is necessary). I would hold, therefore, that the regularly used non-owned car exclusion violates public policy as reflected in the Department's currently prevailing substantive rule, which expressly establishes the minimum UM coverage required and constitutes the best indicator of minimum UIM coverage required, at least in terms of available geographic exclusions.[40]

As other courts and commentators have recognized, the UM/UIM arena is complex, and the expansive litigation it has generated has yielded transitional decisional law. *See generally* J. RONCA, L. SLOANE, D. LUTZ, *et al.*, PENNSYLVANIA MOTOR VEHICLE INSURANCE 2d at xxvi ("The past twenty three years teaches us that automobile insurance law is in a constant state of change."). Certainly, affirming the Superior Court would have the effect of fostering additional change. The Insurance Department could elect to amend its regulations to align them with its present approval practices so as to allow for geographic exclusions such as the other owned vehicle/household family member and regularly used non-owned car exclusions which it determined were justified as a reasonable impingement upon the remedial objectives of the MVFRL based upon the cost containment objective. In this regard, I note that the process

**40.** Although the parties have not referenced the Insurance Department's regulations in their briefs, the case is about whether the regularly used non-owned car exclusion violates public policy, and this Court has traditionally considered the Department's regulations a significant factor in making this assessment. *See, e.g., Hall*, 538 Pa. at 347, 648 A.2d at 760; *see also supra* note 31. Further, as explained below, a valid judgment, order, or award is entitled to respect and should therefore be affirmed for any proper basis appearing from the record, and, in this regard, the Court is not constrained by the parties' arguments with regard to Mr. Burstein's claim. *See infra*.

established for the promulgation of substantive rules affords the opportunity for participation to the involved interests. Moreover, in the longer term, this would have a stabilizing effect as the Department formally settles on its own interpretation, and the courts adhere, on a consistent basis, to their limited role in terms of the direction of social policy in the face of competing policy concerns.

## V. Alternative Ground Supporting Affirmance as to Mr. Burstein's Claim

Finally, there is an additional ground upon which the award in favor of Mr. Burstein should be affirmed.

The manner in which an appellate court reviews an award resulting from a common-law arbitration reflects the strong preference for non-judicial resolution of disputes. *See, e.g., Bateman v. Motorists Mut. Ins. Co.,* 527 Pa. 241, 590 A.2d 281 (1991) (when reviewing decision of common-law arbitrators, Supreme Court reverses only for fraud, misconduct, or some type of irregularity which causes unjust, inequitable, or unconscionable award). In accordance with this principle, non-compulsory arbitration awards are generally binding, and judicial review is narrow. *See* 42 Pa.C.S. § 7314 (statutory arbitration review standards); *Borgia v. Prudential Ins. Co.,* 561 Pa. 434, 439–40, 750 A.2d 843, 846 (2000) (common law arbitration). Further, according to more general jurisprudential precepts, an appellate court may sustain a correct judgment or award that is under attack for any reason that is supported by the record. *See Hader v. Coplay Cement Mfg. Co.,* 410 Pa. 139, 145–46, 189 A.2d 271, 274 (1963). This principle applies even though the reason for sustaining the judgment was not raised in the trial court (or, here, before a panel of arbitrators); without regard to whether the decision-maker relied upon such reason in reaching its determination; and without regard to whether the reason has been brought to the attention of the appellate courts.[41] These tenets flow from

41. *See McAdoo Borough v. Commonwealth, Pa. Labor Relations Bd.,* 506 Pa. 422, 428–29 n. 5, 485 A.2d 761, 764 n. 5 (1984); *E.J. McAleer & Co. v. Iceland Products, Inc.,* 475 Pa. 610, 613 n. 4, 381 A.2d 441, 443 n. 4 (1977); *Hader,* 410 Pa. at 145–46, 189 A.2d at 274; *Sherwood v. Elgart,*

a recognition that it is, fundamentally, the judgment itself which is the subject of review, rather than any particular reason or argument advanced by the trial court or the verdict winner, *see Hader*, 410 Pa. at 145–46, 189 A.2d at 274–75 (stating that "[t]he only error upon the record is a wrong reason for a right judgment; but as we review not reasons but judgments, we find nothing here to correct") (quoting *Thomas v. Mann*, 28 Pa. 520, 4 Casey (28 Pa.) 520, 522 (1857)), and, again, from the preference to sustain such verdicts, judgments, and awards as may validly be preserved.

Here, Prudential predicated its position before the arbitrators entirely upon the regularly used non-owned car exclusion contained in its policy. Such exclusion, by its terms, however, applies solely to "**non-owned cars**," printed in bold type to indicate that the phrase is a defined term in the policy. Under the definitional provisions, a "non-owned car" is "a **car** which is not owned by, registered in the name of or furnished or available for the regular or frequent use of **you** or a **household resident**" (emphasis in original). Since it is undisputed that the company car in which the Bursteins were injured was available for their regular use, such car simply is not a "non-owned car" for purposes of the policy. *See generally Adelman*, 386 A.2d at 538 (explaining that, "[w]hen a word used in the exclusion under scrutiny is specifically defined in the definitions section of the policy, it is that definition which must control in determining the applicability of the exclusion") (citing *Great Am. Ins. Co. v. State Farm Mut. Auto. Ins. Co.*, 412 Pa. 538, 194 A.2d 903 (1963)). Therefore, the regularly used non-owned car exemption, applying to "non-owned cars," as defined under the policy, has no application to the company car at issue, and the arbitrators could properly have awarded relief in favor of the Bursteins and rejected Prudential's sole proffered defense on such basis.[42]

383 Pa. 110, 115, 117 A.2d 899, 901 (1955); *see generally* 16–17 STANDARD PA. PRACTICE 2d §§ 91.18, 92.54 (1995).

**42.** The principal intended significance of the policy definition of non-owned car appears to be in relation to the affirmative portability

While this reasoning may seem technical, it is wholly consistent with settled principles of contract construction. The terms of automobile insurance contracts are drafted by the insurer, and, particularly in this all-too-complex arena, this Court has steadfastly maintained that unambiguous written provisions are to be enforced according to their terms, with ambiguities construed against the insurer. *See Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 557 Pa. 595, 606, 735 A.2d 100, 106 (1999). Consumers are faced with sufficient obstacles in making the necessary elections pursuant to the MVFRL without facing confused policy terms. My principal reasoning, as detailed above, recognizes that the General Assembly afforded the Insurance Department latitude to permit insurers to require more of consumers in terms of apprehending the geographic terms of individual policies in order to select appropriate coverage. I would reinforce, however, that insurers must effectively communicate the limits of such coverage to the insured in terms that are precise, meaningful, and plain. In this case, the effect of Prudential's failure to do so provides an alternative ground for affirmance of the award in favor of Mr. Burstein.[43]

In summary, I disagree with the majority's explication of fundamental principles governing UM and UIM coverage, entrenchment of the view that the legislative cost containment objective overwhelms the remedial purposes of Pennsylvania's scheme of insurance regulation, and emphasis on attribution of

provisions. By its terms, the policy covers the vehicles described in the policy *and* non-owned cars used as intended by the owner and with permission. By restricting the definition of non-owned cars to exclude those that are available for the regular or frequent use of the named insured or a household resident, the affirmative provisions of the policy themselves function in the manner of the exclusion claimed by Prudential. Before the arbitrators, however, Prudential did not frame its defense around the affirmative policy provisions or cite to the definitional language. Rather, Prudential invoked the express regularly used, non-owned car exclusion as the sole basis supporting its denial of coverage.

**43.** In this regard, Mrs. Burstein stands in different shoes, since as to her claim, the arbitrators issued an award in Prudential's favor. Accordingly, in her case, Prudential benefits from the applicable review standards, and Mrs. Burstein bore the burden of issue preservation and presentation.

fault to Mrs. Burstein in terms of her failure to supplement employer-provided insurance pertaining to the non-owned vehicle involved. I would hold that the regularly used non-owned car exclusion violates legislative policy as established by the General Assembly and refined in Insurance Department regulations. Moreover, I discern an alternative basis upon which the award in favor of Mr. Burstein should be affirmed.

Accordingly, and respectfully, I dissent.