**FOR PUBLICATION**



FILED

Apr 24 2012, 8:57 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANTS:

**ROGER B. FINDERSON**
Lebamoff Law Offices, A
  Professional Corporation
 Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE:

**KARL L. MULVANEY**
**KANDI KILKELLY HIDDE**
**BARRY C. COPE**
Bingham Greenebaum Doll, LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| SHAWN A. KECKLER, KARI FELDA, Special Administrator to The Estate of RYAN S. HOLLOWAY, JANICE NORMAN, DEWAYNE SCOTT, TIMOTHY J. BOGANWRIGHT, SARA BOGANWRIGHT, and INDIANA FARM BUREAU INSURANCE COMPANY, | ) ) ) ) ) ) ) |
| Appellants-Defendants, | ) ) |
| vs. | )   No. 43A03-1112-PL-551 ) |
| MERIDIAN SECURITY INSURANCE COMPANY, | ) ) ) |
| Appellee-Plaintiff. | ) ) |

**APPEAL FROM THE KOSCIUSKO SUPERIOR COURT**
The Honorable Duane G. Huffer, Judge
Cause No. 43D01-0908-PL-158

**April 24, 2012**

**OPINION - FOR PUBLICATION**

**BARNES, Judge**

## Case Summary

Shawn Keckler, Kari Felda (as Special Administrator to the Estate of Ryan Holloway), Janice Norman and DeWayne Scott (as the mother and father of Bryant Scott), Timothy and Sara Boganwright, and Indiana Farm Bureau Insurance Company ("Farm Bureau") (collectively, "the Appellants") appeal the trial court's entry of summary judgment in favor of Meridian Security Insurance Company ("Meridian") in Meridian's declaratory judgment action. We reverse and remand.

## Issue

The Appellants raise five issues, which we combine and restate as the following two issues:

I.  whether the trial court properly concluded as a matter of law that an exclusionary clause in Meridian's umbrella insurance policy that insured Nathan Creighton at the time of a severe automobile accident caused by him precludes any and all claims by the Appellants against Meridian's policy; and

II.  whether public policy requires exclusion of coverage for the Appellants' claims.

## Facts

Shortly after noon on June 29, 2008, Creighton was driving a car westbound on State Road 25, an undivided two-lane road in Kosciusko County, when he approached a vehicle that was stopped in the westbound lane in front of him and waiting to make a left turn southbound onto County Road 1300 West. Creighton, who was eighteen years old, had three passengers in his car: Scott, Holloway, and Keckler. Instead of stopping

2

behind the turning vehicle, Creighton attempted to pass it on the left, crossing into the oncoming eastbound lane of State Road 25. This caused an immediate head-on collision with a pick-up truck driven by Timothy Boganwright, who was traveling eastbound on State Road 25. Scott and Holloway were pronounced dead at the scene of the accident. Both Keckler and Creighton sustained brain injuries and have no memory of the accident. Boganwright also was injured, but his injuries were not as severe.

Police investigating the crash scene discovered that Holloway was in possession of several bags of marijuana and that Creighton was in possession of one bag of marijuana. Police also stated in a crash report that there was a "strange odor" coming from Creighton's car and that he "also had glassy eyes and appeared very disorderly," although Creighton was unconscious when police arrived on the scene. App. p. 77. There is no evidence as to whether the "strange odor" was consistent with marijuana, either burnt or fresh. Neither Creighton nor Keckler can remember much, if anything, that occurred on the day of the accident, and nothing about the accident itself.

Police obtained a search warrant to test Creighton's blood and urine at the hospital for drugs and alcohol. The test results were negative for alcohol but positive for cannibinoids, i.e., marijuana. Creighton later was charged with and pled guilty to one count of Class D felony operating a vehicle with a controlled substance in the body resulting in serious bodily injury, pursuant to Indiana Code Section 9-30-5-4(a)(2).

At the time of the accident, Creighton's primary insurer (through his father) was Progressive, with a global policy limit of $500,000. Creighton also was an insured under

3

his father's umbrella policy issued by Meridian, with a coverage limit of $1,000,000. Keckler, Felda, Norman and Scott, and the Boganwrights each filed separate lawsuits against Creighton for personal injury or wrongful death. Farm Bureau, the Boganwrights' insurer, is pursuing subrogation against Progressive for payments it has made to the Boganwrights. After these lawsuits were filed, Meridian filed a separate declaratory judgment action against the Appellants asserting that it was not required to provide coverage for any injuries caused by Creighton because of the following exclusionary clause in the policy:

> The coverages provided by this policy do not apply to . . . "Bodily injury" or "personal injury" arising out of . . . [t]he use, sale, manufacture, delivery, transfer or possession by any person of a Controlled Substance(s) as defined by the Federal Food and Drug Law at 11 USCA Sections 811 and 812. Controlled substances include but are not limited to cocaine, LSD, marijuana and all narcotic drugs. However, this exclusion does not apply to the legitimate use of prescription drugs by a person following the orders of a licensed physician . . . .

App. pp. 40, 42. The declaratory judgment complaint also alleged that the injuries fell under the policy's exclusionary clause for "expected or intended" injuries. Id. at 40.

Keckler filed a motion for summary judgment against Meridian, in which the other Appellants joined, and Meridian responded with a cross-motion for summary judgment. As part of its designation of evidence, Meridian submitted the deposition of a toxicologist, Dr. Daniel McCoy. Dr. McCoy reviewed Creighton's hospital test results as well as depositions given by Creighton and Keckler, which were inconclusive on any

4

time frame in which Creighton might have last smoked marijuana before the accident. Dr. McCoy explained that the test performed by the hospital was "generic" and did not indicate whether the cannibinoids in Creighton's system were THC, or carboxy THC, or a combination of the two.[1]  App. p. 165.  THC is the psychoactive ingredient in marijuana, while carboxy THC is not psychoactive but is a metabolite of THC, or "a residual non-active drug that hangs on or keeps or it stays around for a longer period of time." Id.  Carboxy THC can be detected within a person's body for days after smoking marijuana, while the psychoactive effect and detectable amount of THC peaks at about twenty to thirty minutes after usage and then declines.  Also, a person who frequently smokes marijuana may have carboxy THC in their system essentially "all the time." Id. at 168.  Dr. McCoy opined that, for normal activities, the psychoactive effect of marijuana is felt for three to six hours, although testing of persons having to perform complicated tasks, such as pilots, has indicated that marijuana may affect the performance of such tasks for as long as twenty-four hours.

At one point, Dr. McCoy testified that the driving maneuver Creighton made in crossing into the oncoming lane of traffic was "consistent with marijuana use." Id. at 162.  Upon further questioning, Dr. McCoy testified that the maneuver also was consistent with any number of other factors that could distract a driver, such as using a cell phone or eating.  Dr. McCoy agreed that he did not know, based on the hospital test result, "when Mr. Creighton would have last used marijuana," and also that there could

[1] There is another type of testing for cannibinoids that can differentiate between THC and carboxy THC, but it is not usually performed by hospitals and was not performed here.

5

not be any testing now performed, even if a sample of Creighton's blood still existed, that could reliably determine the last time he had smoked marijuana. Id. at 174. The following colloquy between Dr. McCoy and counsel also took place:

> Q: All right. Doctor, let me ask you this: As you sit here, can you say that it's more likely than not that Mr. Creighton's actions in this wreck were caused by THC intoxication versus some other reason?
>
> A: No I cannot.
>
> Q: Is there any way that you can think of now, any additional information that is available that you have not seen that you believe would change that opinion?
>
> A: I don't believe there's any information available that would.

Id. at 179. Dr. McCoy again stated that he did not have "an actual opinion on Nathan Creighton's intoxication at the time of this collision . . . ." Id. at 184. He also was asked whether he could say "to any degree of scientific probability . . . whether or not this wreck arose out of the use of marijuana," and he replied, "I can't say that with any degree of precision at all." Id. at 196.

On November 7, 2011, the trial court entered summary judgment in favor of Meridian. The trial court noted that "[n]o blood test was performed on Nathan S. Creighton's blood to determine its level of THC, the psychoactive or impairing element of marijuana." Id. at 19. It also concluded, "The facts do not demonstrate that the possession or transportation or marijuana within the Dodge Intrepid driven by Nathan S. Creighton was the efficient and predominating cause of the accident." Id. However, the

6

trial court ruled that Meridian was not required to provide any coverage for the accident, observing that the general public policy of Indiana "is that no illicit drug use shall occur while driving a vehicle" and that under the criminal law, "'there is no accepted agreement as to the quantity of a controlled substance needed to cause impairment.'" Id. (quoting Bennett v. State, 801 N.E.2d 170, 176 (Ind. Ct. App. 2003)). The Appellants now appeal.

**Analysis**

Our standard of review for the grant or denial of a motion for summary judgment is the same as it is for the trial court originally ruling on the motion: whether there is a genuine issue of material fact, and whether the moving party is entitled to judgment as a matter of law. Kroger Co. v. Plonski, 930 N.E.2d 1, 4-5 (Ind. 2010). Summary judgment should be granted only if the designated evidence shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Id. at 5. "All factual inferences must be construed in favor of the non-moving party, and all doubts as to the existence of a material issue must be resolved against the moving party." Id.

The fact that cross-motions for summary judgment are filed does not alter this standard of review. Life v. F.C. Tucker Co., Inc., 948 N.E.2d 346, 350 (Ind. Ct. App. 2011). Additionally, where, as here, a trial court enters findings of fact and conclusions thereon as part of its summary judgment ruling, our standard of review is not altered. Runkle v. Runkle, 916 N.E.2d 184, 191 (Ind. Ct. App. 2009), trans. denied. Such

7

findings and conclusions merely aid our review by providing us with a statement of reasons for the trial court's action.  Id.

### I. Insurance Policy Language

This case turns upon an exclusionary clause in Meridian's policy.  Interpretation of an insurance policy is a question of law that is appropriate for summary judgment. Bradshaw v. Chandler, 916 N.E.2d 163, 166 (Ind. 2009).  Insurance policies are governed by the same rules of construction as other contracts and unambiguous terms in policies are given their ordinary meaning.  Id.  "We interpret policy terms 'from the perspective of an ordinary policyholder of average intelligence.'"  Id. (quoting Allgood v. Meridian Sec. Ins. Co., 836 N.E.2d 243, 246-47 (Ind. 2005)).  If there is an ambiguity in a policy, we construe it strictly against the insurer.  Id.  "This is particularly the case where a policy excludes coverage."  Id.  We will nevertheless enforce limits on coverage if the policy unambiguously favors the insurer's interpretation.  Id.

"We will not remove a risk from coverage if the policy can be construed to reasonably protect that risk."  Moons v. Keith, 758 N.E.2d 960, 962 (Ind. Ct. App. 2001), trans. denied.  An exclusionary clause in an insurance policy "'must clearly and unmistakably express the particular act or omission that will bring the exclusion into play.'"  Estate of Kinser v. Indiana Ins. Co., 950 N.E.2d 23, 26 (Ind. Ct. App. 2011) (quoting Jackson v. Jones, 804 N.E.2d 155, 158 (Ind. Ct. App. 2004)).  Similarly, an exclusion in an insurance policy must clearly and unmistakably bring within its scope the particular act or omission that will give rise to the exclusion in order to be effective, and

8

coverage will not be excluded or destroyed by an exclusion or condition unless such clarity exists.  Id. at 27 (quoting Asbury v. Indiana Union Mut. Ins. Co., 441 N.E.2d 232, 242 (Ind. Ct. App. 1982)).  Generally, when an insurer wishes to rely upon an exclusionary clause in its policy, it is raising an affirmative defense to coverage and it bears the burden of proving its applicability.  Hoosier Ins. Co. v. Audiology Found. of America, 745 N.E.2d 300, 309 (Ind. Ct. App. 2001), trans. denied.

Again, Meridian's policy excludes coverage for any claim for personal injury "arising out of . . . [t]he use, sale, manufacture, delivery, transfer or possession by any person" of a controlled substance, including marijuana.  App. p. 42.  Although both Creighton and Holloway were both found to be in possession of marijuana at the time of the accident, the trial court concluded that the accident did not "arise out of" the possession or transportation of marijuana.  On appeal, Meridian makes no argument that the trial court erred on that point.  It also makes no argument that the injuries fell under the policy's exclusionary clause for "expected or intended" injuries.  Id. at 40.  It argues solely that the accident and the injuries suffered by Boganwright, Holloway, Keckler, and Scott arose out of Creighton's "use" of marijuana.

In Indiana, the phrase "arising out of" as used in insurance policies long has been construed to mean that one thing must be the "efficient and predominating" cause of something else.  See Indiana Lumbermens Mut. Ins. Co. v. Statesman Ins. Co., 260 Ind. 32, 34, 291 N.E.2d 897, 899 (1973).  For example, in Sharp v. Indiana Union Mutual Insurance Co., 526 N.E.2d 237 (Ind. Ct. App. 1988), trans. denied, we addressed a

9

homeowner's insurance policy that excluded coverage for claims "arising out of" the use of a motor vehicle by the insured. In that case, a person injured in a car crash with the insured attempted to argue that this exclusion did not apply, because the insured's excessive drinking at home and resulting extreme intoxication before driving was the true cause of the accident. We rejected this argument, concluding that the use of the vehicle was the "efficient and predominating" cause of the injuries and that the insured's consumption of alcohol before driving did not cause any injury that was independent of the use of the vehicle. Sharp, 526 N.E.2d at 240. Additionally, when there is more than one possible cause of an otherwise insurable injury, it generally is a question of fact as to what the predominant cause of the injury was in order to determine if the injury "arose out of" an activity that is excluded from coverage. See Barga v. Indiana Farmers Mut. Ins. Group, Inc., 687 N.E.2d 575, 579 (Ind. Ct. App. 1997), trans. denied.

Thus, here, in order to invoke the controlled substances exclusionary clause in its policy, Meridian was required to establish that Creighton's use of marijuana was the efficient and predominating cause of the injuries to Boganwright, Holloway, Keckler, and Scott. We hold that Meridian failed to meet this burden on summary judgment. Although Meridian attempts to convince us otherwise, Dr. McCoy's testimony does not establish as a matter of law that Creighton's use of marijuana at some point was the efficient and predominating cause of the accident.

First, we believe that persons of average intelligence reading Meridian's policy and its exclusion for injuries "arising out of" the use of marijuana would presume that,

10

for the exclusion to have effect in the case of a car accident, there must be some evidence that the accident was caused by or at least related to marijuana's impairing or psychoactive effects, or possibly use of the drug while driving. We find the exclusionary clause to be unambiguous in that regard; even if it were ambiguous, we would construe it against Meridian to make application of the exclusionary clause more limited in its scope.

We also conclude that case law regarding criminal convictions for operating a vehicle with a controlled substance in one's blood, or for operating a vehicle while intoxicated resulting in death or serious bodily injury, have little to no application in this context. In the case cited by the trial court, Bennett v. State, 801 N.E.2d 170, 176 (Ind. Ct. App. 2003), this court held that it was constitutional for the legislature to make it a crime to operate a motor vehicle with metabolites of a controlled substance in one's body and cause death, even if there was no evidence that the controlled substance actually impaired the person's driving ability. Bennett, 801 N.E.2d at 177-78. This presents a much different analysis than the interpretation of an insurance policy's exclusionary clause.

Moreover, we stated "that there is no accepted agreement as to the amount of controlled substances necessary to cause impairment." Id. at 177. As support for this proposition we cited Shepler v. State, 758 N.E.2d 966 (Ind. Ct. App. 2001), trans. denied. Shepler, in turn, based this statement upon the testimony of a probation officer who had received training in the effect of marijuana on the human body and who had said "that it is not possible to determine the amount of marijuana . . . present in a person's body" and

11

that "there is no accepted agreement as to the amount of marijuana . . . necessary to cause impairment." Shepler, 758 N.E.2d at 968. Here, by contrast, Dr. McCoy's testimony clearly establishes that it is possible for a person to test positive for the presence of marijuana cannibinoids in his or her system on the sole basis of the presence of the non-psychoactive marijuana metabolite carboxy THC, as opposed to the psychoactive ingredient THC. According to Dr. McCoy, it also is possible to perform a test for marijuana usage that can reveal whether the person has any of the psychoactive THC in his or her system, but that no such test was performed on Creighton.

We also observe that in order to support a conviction for operating while intoxicated causing death or serious bodily injury, or operating with a controlled substance in the body causing death or serious bodily injury, the prosecution does not have to prove a causal link between the person's intoxication or use of a controlled substance and the death or injury. See Abney v. State, 766 N.E.2d 1175, 1178 (Ind. 2002). Rather, the prosecution only needs to prove that the defendant's "driving conduct" was a substantial cause of the death or injury. Id. Here, under well-established principles of insurance policy interpretation, in order to rely upon the exclusionary cause Meridian must prove that Creighton's use of marijuana was the efficient and predominate cause of the accident and the injuries to Boganwright, Holloway, Keckler, and Scott. Under Abney, Creighton's guilty plea to operating a motor vehicle with a controlled substance in the body resulting in serious bodily injury, pursuant to Indiana Code Section 9-30-5-4(a)(2), did not establish that his use of marijuana was the efficient and

12

predominate cause of the accident. In sum, we conclude that the criminal law statutes on operating a vehicle with a controlled substance in the body do not control the issues here.

Turning back to Dr. McCoy's deposition, Meridian argues that he "found that it was more likely that the marijuana in Creighton's blood and urine was from usage within eighteen (18) hours before the accident," and that he "testified that the intoxicating effects of marijuana can last up to a maximum of twenty-four (24) hours." Appellee's Br. p. 12. Dr. McCoy's actual testimony on this point was much less definitive than Meridian makes it out to be. Here is the question and answer that Meridian relies upon:

> Q: Now, does the fact that these test results were positive allow you to draw any conclusions about whether that usage of marijuana was, for example, more likely in the last 18 hours before the accident than in a day or two or three before the accident?
>
> A: Very difficult to respond in more likely. I can say this: That because the detection in the blood as opposed to the also detection in the urine, the time frame for use would be shorter in terms of the transitive of marijuana in its drugs or its constituents throughout the body. I can't specify that it would be within 18 hours necessarily, but it's more likely it would be within that time frame than outside of that time frame. But that's just a probability that it's not possible to judge exactly how probable or how great that probability is.

App. p. 190. Even standing alone, this question and answer is highly equivocal on the probability that Creighton had ingested marijuana less than eighteen hours before the accident. Certainly, Dr. McCoy did not intend to give any opinion that Creighton would have been feeling the psychoactive effects of marijuana at the time of the wreck, given his testimony elsewhere that he did not have "an actual opinion on Nathan Creighton's

13

intoxication at the time of this collision . . . ." Id. at 184. Meridian also notes that Dr. McCoy agreed that if Creighton had smoked marijuana within three to six hours of the accident, it would be much more likely that the marijuana played a role in the accident. However, there was in fact no evidence that Creighton smoked marijuana within three to six hours of the accident; the question to that effect from counsel was purely hypothetical.

Meridian also seems to suggest that it could be inferred that Creighton had smoked marijuana not long before the accident based on these observations from the police officers responding to the crash: that Holloway and Creighton both were found in possession of marijuana, that a "strange odor" was noted to be coming from the car, and that Creighton "had glassy eyes and appeared very disorderly," although he also was reported to be unconscious. Id. at 77. Although there was marijuana in the car, there is no mention of any paraphernalia used to smoke marijuana being found. As for the "strange odor," there is no evidence that it was a marijuana-related odor, and even if it was, whether it was an odor associated with fresh or raw marijuana, such as Holloway and Creighton possessed, or burnt or recently-smoked marijuana. Finally, as for Creighton's "glassy eyes" and "disorderly" demeanor, there is no evidence that such observations were more consistent with marijuana usage as opposed to suffering a brain injury in a head-on motor vehicle collision. We readily conclude, after reviewing the entirety of Dr. McCoy's deposition and the other designated evidence, that there is a genuine issue of material fact as to whether Creighton was under the psychoactive

14

influence of marijuana at the time of the accident and, therefore, whether Creighton's use of marijuana was the efficient and predominant cause of the accident and resulting injuries. As such, Meridian has not established as a matter of law that the accident arose out of the use of marijuana, as required to invoke the exclusionary clause in its policy regarding controlled substances.[2]

We note that this case is much different than one cited by Meridian, <u>Forman v. Penn</u>, 945 N.E.2d 717 (Ind. Ct. App. 2011), <u>trans. denied</u>. There, we addressed the applicability of a controlled substances exclusion in a homeowner's policy that was virtually identical to the exclusion here. A guest at the insured's home suffered permanent injuries after he ingested methadone that had been prescribed to one of the home's occupants. The guest later sued the insured. The insurer sought to avoid providing coverage based on the controlled substances exclusion; the trial court entered summary judgment in favor of the insurer, and we affirmed. <u>Forman</u>, 945 N.E.2d at 721. We held that although an occupant of the house had a prescription for the methadone, the injured party did not. <u>Id.</u> Thus, his injuries clearly arose out of the illegitimate use of the drug. <u>Id.</u> Here, by contrast, the evidence currently is lacking regarding a causal link between Creighton's use of marijuana and the wreck and ensuing injuries.

## II. Public Policy

---

[2] The Appellants also contend that Dr. McCoy's testimony was not even admissible, under Indiana Evidence Rule 702, on the question of whether Creighton was under the influence of marijuana at the time of the accident. We need not resolve that question, having concluded that his testimony was insufficient to establish that fact for summary judgment purposes.

15

Regardless of the lack of conclusive, undisputed evidence that the accident here arose out of Creighton's use of marijuana, Meridian essentially contends that we should read a "public policy" exclusion into its insurance policy, as the trial court effectively did. In a nutshell, Merdian argues that because Creighton admitted to committing a crime in connection with the accident, i.e. having marijuana and/or its metabolites in his body at the time, we should not require it to provide coverage for any injuries associated with the accident. We disagree.

Meridian cannot direct us to any Indiana case that has read a "public policy" exclusion into an insurance policy. Meridian does argue that "public policy considerations were . . . implicit" in this court's decision in General Housewares Corp. v. National Surety Corp., 741 N.E.2d 408 (Ind. Ct. App. 2000), where we held that the "known loss doctrine" will preclude coverage for a loss that has already occurred of which the insured had actual knowledge, even where the policy does not expressly exclude coverage for such a loss. We disagree that "public policy" was a consideration in our decision, as opposed to a matter of contract interpretation based upon "the fundamental requirement in insurance law that the loss be fortuitous." Id. at 413. There is no claim here that the losses were not "fortuitous." Meridian also cites cases, such as City of Muncie v. United National Insurance Co., 564 N.E.2d 979 (Ind. Ct. App. 1991), that mention "public policy" in the context of interpreting insurance policy exclusions for intentionally caused injuries. See also Allstate Ins. Co. v. Boles, 481 N.E.2d 1096, 1098 (Ind. 1985) ("Insurance companies are free to limit their liability in a manner not

16

inconsistent with public policy as reflected by case or statutory law."). These cases do not support citing public policy to alter or add to the language of an insurance policy.

Given the lack of Indiana law on point, Meridian relies heavily upon a case from Pennsylvania, <u>Minnesota Fire and Casualty Co. v. Greenfield</u>, 855 A.2d 854 (Pa. 2004). There, a drug dealer sold heroin to a woman in his home; the woman then took the heroin and died from an overdose of it in the home. The drug dealer subsequently pled guilty to involuntary manslaughter and unlawful delivery of heroin. The drug dealer was insured under a homeowner's policy that did not contain any explicit exclusion for injuries "arising out of" the use of controlled substances. The insurer filed a declaratory judgment action, and the Pennsylvania intermediate appellate court held that the insurer was not required to provide any coverage to the drug dealer under the theory of "inferred intent," or in other words that the drug dealer's provision of heroin to the deceased made her adverse reaction to it "an expected occurrence" and thus excluded from coverage under the policy's language.

The Pennsylvania Supreme Court affirmed the intermediate appellate court but rejected the lower court's reliance on "inferred intent." Instead, the <u>Greenfield</u> opinion held:

> recovery is precluded for damages that arise out of an insured's criminal acts regarding a Schedule I substance, as a matter of overriding public policy. Therefore, in situations when an insured commits a criminal act, with respect to a Schedule I controlled substance, and unintended or unexpected injuries or losses occur as a result, whether by

17

accident or negligence, public policy will not allow coverage
under the contract of insurance.

Greenfield, 855 A.2d at 866. The court stated that although "'[o]nly dominant public policy'" would permit it to invalidate or rewrite a contract, "[i]f the explicit criminalization of use or possession or sale of drugs that have a high potential for abuse, no currently accepted medical use in the United States, and lack of accepted safety for use under medical supervision does not manifest convincing proof of public interest, what would?" Id. at 867 (quoting Burstein v. Prudential Prop. & Cas. Ins. Co., 809 A.2d 204, 207 (Pa. 2002)). The court concluded, "we will not countenance the turning of illegal activities regarding Schedule I controlled substances into money-making occasions." Id. at 869.[3]

We decline to find Greenfield to be persuasive authority for rewriting the Meridian policy to allow it to exclude coverage in this case for the following reasons. First, even though the Greenfield majority read an exclusionary clause into the policy, it still stated that recovery would be precluded for damages "that arise out of an insured's criminal acts regarding a Schedule I substance . . . ." Id. at 866 (emphasis added). As we have already held, there is insufficient evidence here for summary judgment purposes that the accident and resulting injuries "arose out of" Creighton's use of marijuana.

Second, we note that the Greenfield majority expressly did not overrule an earlier case, Eisenman v. Hornberger, 264 A.2d 673 (Pa. 1970), which had refused to exclude

---

[3] Two of the court's justices dissented, arguing that "this court should not rewrite the contract for the insurance company." Id. at 872 (Cappy, C.J., dissenting).

18

insurance coverage for a fire accidentally and unintentionally started by an insured while he was committing a burglary.  See id.  The Eisenman court held that because the policy at issue did not contain a clause excluding coverage for any damages arising out of a "violation of law," it would not rewrite the policy to include such a clause.  Eisenman, 264 A.2d at 675.  That court found no "overriding public policy which would preclude recovery."  Id.  It noted there was no evidence the insurance policy was purchased in contemplation of committing a crime, or that it promoted the burglary, or that it was plausible that denying coverage would act as a criminal deterrent.  Id.  Finally, the court stated, "the sanctions of the criminal law and the coverage of the insurance policy address themselves to quite separate and distinct actions on the part of the insured."  Id.

By merely "providing further refinement" of Eisenman, rather than overruling it, the Greenfield majority thus carved out a special exception for Schedule I controlled substances and damages arising out of crimes committed in connection with them, while apparently continuing to allow insurance coverage for damages that unintentionally or unexpectedly arise out of other crimes, such as burglary, unless a policy expressly excludes coverage in such cases.[4]  See Greenfield, 855 A.2d at 866.  We believe it is dangerous for a court to decide by judicial fiat that the unintended consequences of some crimes are insurable, while the unintended consequences of other crimes are not.  The

---

[4] We also note that the Greenfield majority apparently placed no importance on the insured's conviction for involuntary manslaughter.

fact of the matter is that insurance companies are fully capable of drafting exclusionary clauses to their liking.

Indeed, Meridian's policy does contain an exclusion of coverage for any "'[p]ersonal injury . . . [a]rising out of a criminal act committed by or at the direction of one or more 'insureds' . . . .'" App. p. 40. The type of injuries for which the Appellants are seeking recovery here are "bodily" injuries, not "personal."[5] Thus, this particular exclusion does not cover their claims. Nonetheless, this exclusion is clear evidence that Meridian knew how to draft an exclusionary clause similar to the one it is asking us to impose in this case with respect to the Appellants' "bodily injury" claims. We are not persuaded that we ought to rescue Meridian from drafting its policy in this manner.

Similarly, our third reason for not following Greenfield is the well-settled principle of Indiana law that "[w]e may not rewrite an insurance contract." Bowen v. Monroe Guar. Ins. Co., 758 N.E.2d 976, 980 (Ind. Ct. App. 2001). The power to interpret insurance policies does not extend to changing their terms. Gregg v. Cooper, 812 N.E.2d 210, 215 (Ind. Ct. App. 2004), trans. denied. Reading a "public policy" exception into Meridian's policy would be a rewriting of the policy, in contravention of established law that prohibits such rewriting. We believe that such a radical departure from Indiana law must be undertaken by our supreme court or the legislature.

---

[5] "Personal injury" is defined in the policy as injury arising out of matters such as false arrest, malicious prosecution, libel, slander, or invasion of privacy. "Bodily injury" is "bodily harm, sickness, or disease, including required care, loss of services and death that results." App. p. 38.

In sum, we conclude that Meridian has not met its burden on summary judgment of establishing that the exclusionary clause for injuries arising out of the use of marijuana applied in this case. Our holding today has no effect on the validity of cases such as Bennett and Shepler that decided much different questions in the context of the criminal law. As the Pennsylvania Supreme Court noted in Eisenman, "the insurance policy in no way saves the insured from the consequences of his criminal act." Eisenman, 264 A.2d at 675. Creighton has been penalized for that act. Denying insurance coverage here, on the other hand, would have drastic consequences not only for Creighton, but also for "innocent" injured parties seeking recompense for the injuries he caused.

## Conclusion

We reverse the entry of summary judgment in favor of Meridian and remand for further proceedings consistent with this opinion.

Reversed and remanded.

FRIEDLANDER, J., and MAY, J., concur.