In the

# United States Court of Appeals

## For the Seventh Circuit

No. 19-2433

MARKEL INSURANCE COMPANY,

*Plaintiff-Appellee,*

*v.*

LILLIAN MARLENE RAU, as Personal Representative of the Estate of Decedent, CHESTER R. STOFKO,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 2:16-cv-220-HAB — **Holly A. Brady**, *Judge.*

ARGUED JANUARY 22, 2020 — DECIDED APRIL 9, 2020

Before WOOD, *Chief Judge*, and SYKES and HAMILTON, *Circuit Judges*.

WOOD, *Chief Judge*. United Emergency Medical Services, LLC ("United") owns a fleet of ambulances. In 2016, Chester Stofko was driving his car when one of United's ambulances crashed into it; Stofko's injuries were fatal. Lillian Rau, as personal representative of Stofko's estate, filed a lawsuit in state court against United and the driver to recover damages.

At the time of the accident, United was insured by Markel Insurance Company. The particular ambulance that crashed, however, was not listed on the policy. Rau argues that it was nevertheless covered by the policy because before the crash United sent Markel's agent, Insurance Service Center ("Center"), an email requesting that the vehicle be added to the policy. Markel insists that even if United had sent an email, it never endorsed the change, which the policy requires, and so it has no duty to indemnify United or the driver and no duty to defend with respect to Rau's suit.

Seeking a declaratory judgment to this effect, Markel filed the present suit in federal court. On cross-motions for summary judgment, the district court found that Markel had no obligation to United or its employee under the policy. We agree with this conclusion, and so we affirm.

**I**

United's Administrative Director, Steven Pavek, has worked since 2007 with Center's Jack Rosen to obtain insurance for United's fleet of ambulances. In insurance terminology, Center is a producer for Markel, meaning Center acts as a middleman that gathers applications for insurance, including United's applications for renewal, and sends them to Markel. United's annual insurance renewal deadline was March 5.

For the 2014–2015 policy period, Rosen emailed Pavek in January 2014 to remind him to complete an application for the upcoming renewal. Rosen instructed Pavek to verify the vehicle schedule and emphasized the importance of listing "every operable [vehicle] on the policy," because coverage extends only to vehicles listed as "covered autos." Pavek responded

twelve days later, stating that he had left Rosen several voice messages and emails with no response. According to Rosen, he never received any of these emails or calls. On March 4, Rosen emailed Pavek and United owner Jason Blankinship with further instructions for completing the required paperwork to renew coverage. Pavek responded by email with the required forms. The next day, Pavek emailed Rosen to check if he had received the email and paperwork. Rosen responded that he had not. Pavek emailed back once again, explaining that United's email server was "not pushing mail out some times." He also said, "I didn't think you had it[.] I knew you would have replied with a quick 'got it' or something." Pavek resent the paperwork and successfully renewed United's coverage.

As the next renewal anniversary approached, in January 2015, Rosen emailed Pavek to request that he send United's renewal paperwork by February 9. Rosen did not receive a response within that time, and so he called Pavek to see whether United wanted to renew its coverage. On February 10, Pavek emailed Rosen, saying that he would send United's paperwork by the end of the day. Nothing showed up, however, and so Rosen followed up again on February 13.

On February 23, Pavek emailed Rosen with the paperwork and mentioned that he thought United was "having email issues again" because he had "sent this twice." Pavek also wrote, "If I do not get a reply by the end of Business day I will call to confirm and fax it instead. Please let me know you received it."

Still during the renewal process, on February 27, Pavek emailed Rosen about two specific ambulances that had motor problems. He thought one of them was "permanently done"

and should be removed from the policy. With respect to the second one, Ford #4497 (the ambulance that later crashed), Pavek told Rosen that he did not know if it was salvageable. For the time being, however, he asked that Ford #4497 be removed from the policy, commenting that "[t]his unit is the unit I am unsure of viability moving forward but it will [be] some time before I do, say at least 60 days + repair time." With Ford #4497 off the policy, Pavek identified a third ambulance to add in its place.

Rosen forwarded this email to Gladys Jara, one of his colleagues at Center. The accompanying message stated: "United … will be renewing their program. Please see below for changes that we will be making on their program Monday." On March 3, Jara emailed Markel asking that it bind coverage effective March 5, 2015, with the requested changes—the removal of two ambulances, including Ford #4497, and the addition of another ambulance.

In keeping with Jara's request, Markel renewed United's insurance for the 2015–2016 policy year, which ran from March 5, 2015, to March 5, 2016 ("the Policy"). When the Policy was issued, the schedule of covered autos included five ambulances; as agreed, Ford #4497 was not one of them. Center mistakenly sent six auto ID cards for the renewal to Pavek's email; it included a card for each of the listed five ambulances and an extra card for Ford #4497.

Later in March, evidently not confused by the extra ID card, United decided it wanted to put Ford #4497 back on the Policy. The Policy permitted changes in certain circumstances:

This policy contains all the agreements between you and us concerning the insurance afforded. [United] is authorized to make changes in the terms of this policy with [Markel's] consent. This policy's terms can be amended or waived only by endorsement issued by [Markel] and made a part of this policy.

To initiate changes, Center was required to send a written request to Markel. That request would then be placed in Markel's underwriting file. Center did not itself have the authority to make changes. The Policy also stated, "Notice given by or on behalf of [United] to any of [Markel's] authorized agents in Indiana, with particulars sufficient to identify the insured, shall be considered to be notice to [Markel]."

On March 30, 2015, Pavek emailed Rosen to request that Ford #4497 be added back on the Policy and that a different ambulance be removed. He copied United's owner, Blankinship, on that email. In his request, he listed the specific ambulances that he wanted on the Policy and stated, "Also before I forget we took a truck off the policy a few months ago for a transmission issue that was down for a few months. I'm sure you recall this, I know Thomco doesn't like us to add & remove units like musical chairs … I can just write [it] in on the state form and hopefully they [won't] have a problem with it." Pavek never followed up on the March 30 email. Previously when United had emailed Center to add or remove vehicles from its policy, United received an endorsement from Markel that reflected the changes.

On January 2, 2016, Abraham Nadermohammadi, an ambulance driver for United, was driving Ford #4497 when he struck a vehicle occupied by Stofko. Stofko suffered extensive injuries that eventually led to his death about three months

later. It soon became apparent that Ford #4497 was never formally added back on the Policy.

After the accident, Blankinship found his copy of the March 30 email that requested Ford #4497 be put back on the Policy. On January 4, 2016, Blankinship forwarded that email to Pavek, who forwarded it to Rosen. Rosen asserted that this was the first time he had seen it. Pavek explained that he had worked with United's mail host, Google, to restore all the emails in its domain name, in order to enable United to locate past messages. Pavek admitted that this search had not uncovered any reply from Rosen regarding the March 30 email.

The district court found that Markel had no duty to defend or indemnify United or Nadermohammadi with respect to Rau's suit. It accordingly denied both Rau's and United's cross-motions for summary judgment against Markel. United's third-party claim against Center remains pending in the district court, but the district court entered an order pursuant to Federal Rule of Civil Procedure 54(b) certifying that the judgment in favor of Markel is final.

## II

We review *de novo* a district court's decisions on cross-motions for summary judgment. *Exelon Generation Co., LLC v. Local 15, Int'l Bhd. of Elec. Workers, AFL-CIO*, 540 F.3d 640, 643 (7th Cir. 2008). "With cross summary judgment motions, we construe all facts and inferences therefrom in favor of the party against whom the motion under consideration is made." *In re United Air Lines, Inc.*, 453 F.3d 463, 468 (7th Cir. 2006) (internal quotation marks omitted). Summary judgment is appropriate where "there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56.

A

Rau raises several arguments on appeal. Her primary focus is on United's March 30 email to Center; she argues that despite Rosen's denial, Center actually received the email but failed to forward it to Markel. Rau cites Indiana's Uniform Electronic Transactions Act ("UETA"), IND. CODE § 26-2-8-101 *et seq.*, to explain when emails are considered "sent" and "received." Under UETA, an email is sent "when the information is addressed or otherwise directed properly to the recipient and either: (1) enters an information processing system outside the control of the sender …; or (2) enters a region of an information processing system that is under the control of the recipient." IND. CODE § 26-2-8-114(a). Similarly, an email is received when "(1) it enters an information processing system that the recipient has designated or uses for the purpose of receiving [emails] …; and (2) the [email] is in a form capable of being processed by that system." *Id.* § 26-2-8-114(b).

Based on these definitions, Rau insists that, as a matter of law, United's March 30 email was "sent" by United and "received" by Center. Moreover, she continues, Markel is responsible for Center's failure to forward the email to Markel. Rau cites two cases to support her theory: *State Farm Mut. Auto. Ins. Co. v. Oss*, 127 Ill. App. 3d 119 (1984) and *Wille v. Farmers Equitable Ins. Co.*, 89 Ill. App. 2d 377 (1967).

Rau's cases, however, are not based on Indiana law and are distinguishable in other ways as well. In *Oss*, Oss sought to obtain coverage for a recently purchased car owned and driven by his son. 127 Ill. App. 3d at 120. To trigger the

coverage, Oss contacted an agent for the insurer via telephone and was told that there was "no problem" with the coverage. *Id*. Although the agent orally granted coverage for the car, the agent did not advise Oss that her authority to bind the insurer was limited to a 30-day period, during which the insured was required to complete an application and pay the premium. *Id*. at 121. Believing he had successfully obtained coverage based on the telephone call with the agent, Oss did not complete an application or pay any premium within the 30 days. *Id*. When the car was involved in an accident more than a month later, the insurer denied coverage, asserting that there was no contract of insurance in place beyond the initial 30-day period. *Id*. The court rejected the insurer's position, holding instead that it could not deny coverage because an oral contract of insurance existed and the 30-day limitation was not communicated to the insured. *Id*. at 122–23.

Here, unlike in *Oss*, Center in no way assured United that Ford #4497 was covered. Moreover, as the district court pointed out, the holding in *Oss* was dictated by the existence of an oral contract. The contract in this case is the Policy, which required more than notice before a change takes effect: Markel also had to approve any such change. It is undisputed that Markel did not approve the addition of Ford #4497.

In *Wille*, after an insurance carrier refused to provide insurance, the purported insured had a telephone conversation with an agent who advised him that "he was covered" and that "the agency was getting him insurance through another company." 89 Ill. App. 2d at 379. Although the agent applied for insurance with the purported substitute insurer, no action was taken by that insurer regarding the application. *Id*. The purported insured was then involved in an accident for which

the insurer denied coverage, asserting that it had no record of the application ever being submitted. *Id.* The court found that the insurance company was liable based on an unreasonable delay, whatever the cause, between the application for insurance and the company's response. *Id.* at 381–83.

Based on *Wille*, Rau argues that Markel should be responsible for Center's failure to forward the requested change in the March 30 email. *Wille* is distinguishable, however, because no one gave United assurances that Markel accepted the change. Moreover, in *Wille*, there was again no written contract.

We agree with the district court that we do not need to resolve exactly what happened to the March 30 email in order to decide whether the Ford #4497 ambulance was covered by the Policy. It is a well-settled principle of Indiana law that courts "may not rewrite an insurance contract." *Keckler v. Meridian Sec. Ins. Co.*, 967 N.E.2d 18, 28 (Ind. Ct. App. 2012). The Policy states that its "terms can be amended or waived only by endorsement issued by [Markel] and made a part of this policy." Regardless of whether or not the March 30 email was sent or received, it is undisputed that neither Center nor Markel accepted or responded in any way to United's request to reinstate coverage for Ford #4497. Markel did not endorse any such change to the Policy, and so Ford #4497 was not covered.

## B

Rau next contends that Markel should be estopped from denying coverage for Ford #4497 as a matter of public safety. She contends that ambulance companies, such as United, operate in the same way as commercial motor carriers, because both have a fleet of vehicles and regularly take vehicles in and

out of use for repairs. Commercial motor vehicles are required to have liability insurance coverage containing an MCS-90 Endorsement. See 49 C.F.R. § 387 *et seq.*; IND. CODE § 8-2.1-24-18. The MCS-90 Endorsement mandates that a motor carrier's insurer provide coverage for claims resulting from the negligent operation of a commercial vehicle even if the negligently driven vehicle is not specifically listed under a motor carrier's insurance policy. 49 C.F.R. § 387.15 (2018). But here's the rub: the regulations set forth a 10,001-pound minimum weight for something to be deemed a "commercial motor vehicle." See 49 U.S.C. §§ 31132(1)(A), 31101(1)(A), 49 C.F.R. § 390.5T; see also IND. CODE § 8-2.1-24-18. United's ambulances weigh less than 10,001 pounds. Rau argues nevertheless that United's ambulances are just like commercial vehicles and the public safety principles underlying the requirement for the MCS-90 Endorsement should apply to them equally.

Rau's first problem is that she did not make this argument before the district court, and so she may not raise it now for the first time on appeal. *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012). Moreover, waiver aside, it is uncontested that United's ambulances do not meet the threshold weight limit to be considered commercial motor vehicles, and so the regulations do not apply. "[A]rgument about what makes for good public policy should be directed to Congress; the judiciary's job is to enforce the law Congress enacted, not write a different one that judges think superior." *Bethea v. Robert J. Adams & Assocs.*, 352 F.3d 1125, 1127–28 (7th Cir. 2003). The same principle applies to state legislatures.

## C

Last, Rau argues that equity requires a finding of coverage for Ford #4497. Markel always implemented United's

requests for vehicle exchanges, Rau contends, and so United was lulled into believing that its March 30 email was all that was needed to effectuate the requested one-for-one vehicle exchange. Rau points out that the change did not affect the premium Markel would receive, and she concludes that equity demands coverage.

Markel's amenability to past changes, however, did not mean that it was estopped from rejecting amendment requests. Moreover, Pavek's own testimony showed that he did not believe his email request was sufficient. He testified that someone on Markel's end reviews requested changes, and he admitted that he knew that Markel did not like to add and remove vehicles "like musical chairs." Rau's argument that equity requires coverage for Ford #4497 is not persuasive.

We therefore AFFIRM the district court's judgment.